MAGDALENE STROTTMAN v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY, Appellant.

In Banc, April 2, 1908.

1. **FELLOW-SERVANTS: Telegraph Operator: Engineer.** A telegraph operator at a country station on a railroad whose duty it was to receive telegrams from the train-dispatcher and deliver them to the engineers of trains, and an engineer on a train running on the main line near that station, were fellow-servants within the meaning of section 3 of the Act of 1897, Laws 1897, p. 96. Both were under the control and subject to the orders of the train-dispatcher, neither had any control or superintendence over the other, but both were employed by a common master, and worked together in a common purpose of the same grade in the same department or service of that master, and were, therefore, fellow-servants, not only at common law, but also beyond any sort of question under section 3 of said act, which expressly provides that "all persons who are engaged in the common service of such railroad corporation, and while so engaged are working together at the same time and place to a common purpose of the same grade, neither of such persons being entrusted by such corporation with any superintendence or control over their fellow-employees, are fellow-servants with each other."

2. ———: ———: ———: **Act of 1897.** Section 1 of the Act of 1897 (Laws 1897, p. 96), standing alone, abolishes all distinctions between employees of a railroad and makes it liable in damages for injury to any of its employees engaged in the operation of its road, in the absence of contributory negligence on their part; in fact, an insurer of all persons by it employed, regardless of the kind of service, against injury sustained by reason of the negligence of any other agent or servant, whether fellow-servants or vice-principals, or engaged in the same or different departments of service. But section 1 is not a complete enactment within itself, but is to be construed in connection with sections 2 and 3 with which it is *in pari materia*. Section 2 defines who are vice-principals, and section 3 who are fellow-servants, and neither has any proper place in the act except to define what is meant by section 1. And when so read, the act gives a cause of action for damages to a servant of the railroad injured by the negligence of his fellow-servant, and it does not give a cause of action unless they are fellow-servants.

3. ——: ——: ——: ——: Vice Principal: Departmental
Doctrine. *Held* by WOODSON, J., in a separate concurring opin-
ion, that section 2 of the Act of 1897 does not make a tele-
graph operator a vice-principal of an engineer or of any other
like employee of the railroad; and that section 3 is but de-
clarative of the departmental doctrine of the common law as to
fellow-servants.

4. ——: ——: ——: Title.    The title to an act is essentially
a part of the act, not only because it has been selected and
adopted by the Legislature as one of their tests of its mean-
ing as expressed in the bill, but because the Constitution has
made it a part of the law to which it applies.    It is, there-
fore, useful in affording a fair index of the legislative intent,
in case of ambiguity in the context.    So that the title of the
Fellow-Servant Law of 1897, which reads, "An Act to define
the liabilities of railroad corporations in relation to damages
sustained by their employees, and to define who are fellow-
servants and who are not fellow-servants, and to prohibit con-
tracts limiting liability under this act," indicates that the
purpose of the act was not to abolish all distinctions be-
tween servants and employees of every kind, but to create
a new cause of action, that is, liability for damages on the
part of a railroad company for injuries to its employees due
to the negligence of a fellow-servant while engaged in the
work of operating the railroad.

5. ——: Recovery at Common Law: Transmitted Action.    At
common law the injured servant could not recover damages
from his master for injuries due to the negligence of a fellow-
servant.    Nor was that law changed by Secs. 2864-65, R. S.
1899.    They did not transmit a cause of action to the ser-
vant's widow where the servant himself had no cause of
action.    If the servant's injuries were due to the injuries of
a fellow-servant, neither he, if he survived the injuries, nor
his wife or children, if he died as a result thereof, could
recover damages from his master, the corporation.    Those
sections transmitted the cause of action only when the ser-
vant himself was entitled at common law, had he lived, to
maintain the action.

6. ——: Act of 1897: Recovery by Wife.    The Fellow-Servant
Law of 1897 (Laws 1897, p. 96) gave to the injured servant of
a railroad company the right to recover for injuries due to the
negligence of a fellow-servant, but in case of his death it gave to
his widow no right of recovery.    The act says that every
railroad corporation "shall be liable for all damages sustained
by any agent or servant thereof while engaged in the work
of operating such railroad by reason of the negligence of any
other agent or servant thereof," but it said nothing about

any recovery by his widow in case said injured servant was kiled by reason of the negligence of such other agent or servant. If the right of action survives, therefore, it must be by reason of some other statute.

7. ———: ———: ———: **Transmitted Action: General Damage Statute.** Section 2865, Revised Statutes 1899, holding a corporation liable for damages for the negligent death of a party whenever the person injured would have been entitled to maintain an 'action, does not include a claim for damages for injuries occasioned by a fellow-servant. So that if the widow's husband was a fellow-servant of the railroad's telegraph operator whose negligence was the cause of his death, she cannot recover damages from the railroad company.

8. ———: **Telegraph Operator and Engineer: Recovery of Wife: Facts Stated.** It was the duty of the telegraph operator at a small station on defendant's line of railroad to receive orders from the train-dispatcher, to be delivered to the engineer and conductor, directing the movement of trains. Such an order was sent, announcing that a train was on the track running in an opposite direction, and directing that the train on which plaintiff's husband was engineer to sidetrack at this station for the other to pass. The operator did not deliver this telegram or order to the engineer or conductor, and neither knew that the train coming from the opposite direction was on the track, and they ran their train ahead, a collision resulted, and the engineer was killed. Both the engineer and telegraph operator, to whose negligence the collision was due, worked under the control of and in pursuance to orders from the train-dispatcher, and both worked in the same common service. *Held*, first, that, both at common law and under the Fellow-Servant Law of 1897, they were fellow-servants, and being fellow-servants, the engineer's wife cannot recover from defendant, since he could not had he lived; *second*, the Fellow-Servant Act of 1897, on its face, limits the right of recovery against the railroad company to a servant who is injured because of the negligence of a fellow-servant, and says nothing about the survival of the action to his widow or children; *third*, Secs. 2864-65, R. S. 1899, as has long been held, do not embrace cases of damages by servants of a corporation whose death is due to the negligence of a fellow-servant, and hence those sections do not transmit an action in such case to the deceased servant's widow, for he had no such action himself. Therefore, neither under the Act of 1897, nor under Secs. 2864-65, taken separately, or read together, or read together with the common law, can the widow of a servant whose death was due to the negligence of a fellow-servant, recover against their common master.

9. ———: **Transmitted Action: Affirmance of Former Judgments.** The fact that this court has heretofore affirmed judgments in favor of a widow against railroad corporations, for the death of her husband in fellow-servant cases, in which her right to maintain the action was not disputed or adverted to, is no reason for upholding a judgment in a like case when the point was properly raised in the trial court and is insisted on here.

10. ———: **Act of 1897: Derogation of Common Law.** The Fellow-Servant Law of 1897 is in derogation of the common law, and being such, by universal rule, it must be strictly construed, and will not be enlarged to include a transmitted right to the servant's widow to sue his master for his death, since that right is not expressed therein or implied in the words used.

11. ———:· ———: **New Cause of Action.** The Fellow-Servant Act of 1897 created a new cause of action. It did not place an employee of a railroad corporation in the same position theretofore enjoyed by any other person. It embraced a class of persons who had theretofore been excluded.

12. ———: ———: ———: **Similarity of Cause for Violating Ordinances: Survivorship.** The fact that it has often been held that a cause of action for negligence for a violation of duties imposed on street car companies is transmitted to the widow of the injured person, though no such survivorship is mentioned, is no ground for holding that a right of action survives to the widow of the servant of a railroad company whose death was due to the negligence of a fellow-servant. The violation of a duty imposed by a city ordinance was actionable negligence at common law, and it is the negligence that is the cause of action, and not the new duties or regulations.

*Held,* by **LAMM, J.,** dissenting, that, if the right of action does not survive, under the Fellow-Servant Act of 1897, then, by the same reasoning, it does not survive for a violation of any ordinance or statute regulating the operation of trains and railroads, unless such right of survival is expressly given in such ordinance or statute.

13. ———: ———: **Legislative Interpretation.** The fact that the Legislature in 1905 amended the Fellow-Servant statute so as to give a right of survivorship of a cause of action to the widow in case of the injured servant's death was a legislative interpretation of the Act of 1897 that it did not include such right of survivorship.

Per LAMM, J., dissenting, with whom GANTT, C. J., and VAL-
LIANT, J., concur.

1. **FELLOW-SERVANT: Act of 1897: Legislative Interpretation.**
   Where other reasons are apparent upon the face of a kindred
   subsequent act for its enactment, for instance, where it em-
   braces many subjects, it should not be held to be a legislative
   interpretation of a prior statute on a particular subject; and
   even if so, that interpretation should be given small consid-
   eration in determining the scope of a prior statute.    And so
   the amendment of 1905 to section 2864, R. S. 1899, giving in
   express words to the widow of a servant whose death was
   due to the negligence of a fellow-servant, the right to recover
   damages from his master, is of small value as a legislative
   interpretation of the Fellow-Servant Act of 1897 to the effect
   that such act did not give such right.  .

2. ——: ——: ——: **Prior Decisions.**    And especially should
   that legislative interpretation be so considered, when   the
   amendment was made after this court had in two cases sub-
   sequently to the enactment of 1897 assumed that the right of
   action survived to the widow.

3. ——: ——: ——: **Controlling on Courts.**    But no leg-
   islative interpretation of a statute is binding on the courts.
   It is the province of the judicial department of government
   to interpret laws.    It is for the courts to say what the law is.
   They may be instructed by a legislative construction of exist-
   ing law, but they are not bound by that construction.

4. ——: ——: **Damage Act: Cognate and In Pari Materia.**
   The Damage Act (Sec. 2864, R. S. 1899) and the Fellow-Servant
   Act of 1897 (which is also a damage act) are cognate statutes,
   in pari materia, and should be construed together, as if enacted
   at the same time. Section 2864 says that the action survives to
   the widow whenever her deceased husband had a cause of
   action for damages against a corporation for negligence, and
   the Act of 1897 says a servant has a cause of action against
   a railroad company when his injuries were due to the negligence
   of a fellow-servant.    The two read together form a part of a
   uniform system; and if they had been enacted together, as
   different sections of the same act, no one would doubt that
   the servant's cause of action, in case of his death, survived
   to his widow or children; and the fact that the Fellow-Servant
   Act was enacted subsequently to the Damage Act does not
   alter the legal right of the widow, or make the statutes any
   the less cognate and consociated.

5. ——: ——: **Purpose of Damage Act.**    The purpose of
   section 2865 of the Damage Act was to put an end to 'the old

common-law rule that in negligence cases the action was personal and died with the person injured.    Its purpose was to transmit to the injured person's widow or children a cause of action when he died as a result of his injuries negligently inflicted; it did not create any new cause of action, or give the widow a right to sue when her husband, had he lived, would have had no such right.    But it did provide that, in every case where he would have had a cause of action, it survived to her on his death.    The Fellow-Servant Act of 1897 gave him a cause of action, and section 2865, having provided for a survival of the action where it did not survive at common law, should not now be invoked to strike down the transmission and survival of the new cause of action which did not exist at common law.

6.    ———: ———: Survival.    The right of action given by the Fellow-Servant Act of 1897 to a servant of a railroad company injured through the negligence of a fellow-servant, survived to his widow, in case of his death from such negligence, under Sec. 2865, R. S. 1899.

7.    ———: Engineer and Telegraph Operator.    An engineer on a train and a telegraph operator at a country station on the main line, whose duty it is to receive telegraphic orders directing the movement of trains from the train-dispatcher and deliver them to engineers or conductors and to put out signalboards or semaphores for signaling freight trains to stop for orders, are not fellow-servants.    There is no common employment in a distinct or definite branch of work between them, and neither at common law, nor under the provisions of the Fellow-Servant Act of 1897, which recognizes the departmental doctrine, were they fellow-servants.

8.    ———: Reasonably Safe Place: Change of Schedule: Master's Duty.    It is the master's duty, when trains are put on a track, in opposite directions, on schedule time, to give notice to the engineers of the trains of a change in the schedule, and to provide for them a reasonably safe track on which to run their trains.    If the train-dispatcher has control over the movements of the trains, he stands in the master's shoes; and he does not meet that duty by writing a dispatch and handing it to a messenger boy to be by him handed to a telegraph operator, who sends it to another telegraph operator on the line between the trains, who either does not receive it, or if he receives it does not deliver it to the trainmen. The neglect to deliver the master's order to sidetrack is the master's negligence, whether the failure to deliver the order was the failure of the messenger boy or the local telegraph dispatcher.

Appeal from Jefferson Circuit Court.—*Hon. Frank R. Dearing*, Judge.

REVERSED.

*Louis F. Dinning* and *Martin L. Clardy* for appellant.

. (1) That the engineer, the conductor and the operator were fellow-servants, engaged in a common service, will appear from the decisions in the following cases: McDermott v. Railroad, 30 Mo. 115; Rohback v. Railroad, 43 Mo. 187; Gibson v. Railroad, 46 Mo. 163; Brothers v. Carter, 52 Mo. 372; McGowan v. Railroad, 61 Mo. 528; Marshall v. Schricker, 63 Mo. 308; Smith v. Railroad, 92 Mo. 359; Higgins v. Railroad, 104 Mo. 413; Schaub v. Railroad, 109 Mo. 74; Parker v. Railroad, 109 Mo. 362; Valtz v. Railroad, 85 Ill. 500; Railroad v. Kelley, 127 Ill. 637; Jackson v. Railroad, 43 W. Va. 380; 12 Am. and Eng. Ency. Law (2 Ed.), 990; 1 Thompson on Neg'ce, sec. 31; Wood on Railroads, sec. 388; Beach on Contributory Negligence, sec. 322. The telegraph operator and the two engineers were in a common service; they were employed by a common master; they were working together to a common purpose of the same grade; neither of them had any control or superintendence over the other; they were in the same department, to-wit, the operating department, of the railway company. Moore v. Railroad, 85 Mo. 494; Miller v. Railroad, 109 Mo. 356; Card v. Eddy, 129 Mo. 510. (2) Unless the Act of 1897 creates a cause of action in favor of the widow of deceased, she cannot recover, for it is clear that plaintiff's husband lost his life by reason of the negligence of a fellow-servant. A fair construction of the statute is that the agent or servant and no other person may sue for the damages sustained. The act does not undertake to provide for cases in which the servant suffers death. It does not undertake to transmit a

right to sue for a penalty prescribed many years ago by another act, but is intended to create a cause of action where none existed at common law, or, stated more accurately, to designate the employees who may and may not sue for injuries sustained by reason of the negligence of other employees engaged in the operation of railroads. The cause of action is for injuries— the persons authorized to sue are those who are injured. Complaint ought not to be made that the Legislature did not go further and make provision for the recovery of the death penalty. The cases of Powell v. Sherwood, 162 Mo. 495; Rinard v. Railroad, 164 Mo. 286, and Callahan v. Railroad, 170 Mo. 473, are not in point, and besides, the question raised here was not presented to the court in any one of those cases. The case of Philo v. Railroad, 33 Iowa 50, does not support the contention that respondent can maintain this suit. The Iowa act differs somewhat from our Act of 1897. Sachs v. Sioux City, 109 Iowa 224; Major v. Railroad, 88 N. W. 815. The right to sue for the death of a person cannot exist unless created by law. Packard v. Railroad, 181 Mo. 421; Paddock v. Railroad, 155 Mo. 536.

*H. B. Irwin* and *Byrns & Bean* for respondent.

(1) Defendant is liable in damages for the death of the engineer Strottman, and it does not matter whether the telegraph operator whose negligence caused the wreck was, or was not, a fellow-servant of the engineer. R. S. 1899, secs. 2873, 2874, 2875; Rinard v. Railroad, 164 Mo. 286; Powell v. Sherwood, 162 Mo. 605. (2) The action for damages for the death of engineer Strottman survived to his widow, the plaintiff herein. Powell v. Sherwood, 162 Mo. 605; Rinard v. Railroad, 164 Mo. 286; R. S. 1899, secs. 2864, 2865, 2873; Philo v. Railroad, 33 Iowa 50; Gunz, Admr., v. Railroad, 52 Wis. 676; 12 Eng. and Am. Ency. Law (2 Ed.), p. 978. (3) The engineer and telegraph op-

·erator were not fellow-servants. R. S. 1899, secs. 2874 and 2875; Railroad v. Becker, 46 L. R. A. 815; Railroad v. Warner, 35 S. W. 366; Railroad v. Margrat, 51 Ohio St. 130; Railroad v. Benz, 58 L. R. A. 690; Railroad v. DeArmond, 86 Tenn. 73. (4) Appellant contends that the engineer Strottman, plaintiff's husband, and the operator whose negligence caused his death, were fellow-servants and that there was no liability at common law and none under the Damage Act of this State and as amended by the Legislature in 1897. Appellant contends that section 2873 gives a right of action to the servant only for personal injuries and not to his widow in case of death as provided by sections 2864 and 2865, Revised Statutes 1889. This question has been decided adversely to appellant by this court in the cases of Powell v. Sherwood, 162 Mo. 605, and Rinard v. Railroad, 164 Mo. 286. (5) Were it necessary for this court to determine whether engineer Strottman and defendant's telegraph operator at Blackwell Station were fellow-servants at the time of the injury of the former, we would say that they were not fellow-servants within the meaning of those terms as defined by sections 2874 and 2875. This court was committed to the department doctrine before the enactment of the said statutes. In order for the relation of fellow-servants to have existed between engineer Strottman and defendant's operator at Blackwell they must have been, as required by section 2875, engaged in the common service of the railroad company, and while so engaged, working together at the same time and place, to a common purpose, of the same grade, neither of such persons being entrusted with supervision over the other and in the same department. Respondent contends that, at the time of the injury of the engineer Strottman, he did not possess in common with the operator a single one of the characteristics required to make them fellow-servants. They were not

working together to a common purpose, the work they did, being of a different character, only brought them together casually. They were not engaged in the same department or service of the corporation. Railroad v. Furry, 114 Fed. 898; Railroad v. Becker, 46 L. R. A. 815. The words "department of service" mean a subdivision of business, as running a train, clearing away a wreck, or repairing a track. Railroad v. Warner, 35 S. W. 366; Railroad v. Margrat, 51 Ohio St. 130; Railroad v. Hunter, 70 Miss. 471; Smith v. Railroad, 92 Mo. 359; Sullivan v. Railroad, 97 Mo. 119. Where the department rule prevails the engineer is not the fellow-servant of a telegraph operator. Railroad v. DeArmond, 86 Tenn. 73; Madden v. Railroad, 28 W. Va. 610.

BURGESS, J.—This is an action by plaintiff, Magdalene Strottman, widow of Fred. W. Strottman, against the defendant company, to recover five thousand dollars damages for the death of her husband, who was injured in a collision on defendant's railway on October 22, 1902, from which injuries he thereafter died.

The petition alleges as follows:

"Plaintiff for her amended petition states that on and prior to the 24th day of October, 1903, Fred. W. Strottman was her lawful husband, and that she is now his widow, and that defendant was at said time and long prior thereto a railroad corporation duly organized and existing under the laws of the State of Missouri, and having capacity to sue and be sued as such. Plaintiff says that at said time and long prior thereto defendant owned and operated a railroad extending from the city of St. Louis, in the State of Missouri, to the city of Texarkana, in the State of Arkansas.

"Plaintiff says that defendant on said date and

prior thereto, maintained and operated many trains on said railroad both north and south bound, that all said trains were run as ordered by the agents, officers, servants and employees of said defendant, and that its said trains were being run on the dates hereinafter mentioned.

"Plaintiff says that on the 22d day of October, 1902, and long prior thereto, Fred. W. Strottman was in the employment of said defendant as locomotive engineer, and that on said 22d day of October, 1902, said Fred. W. Strottman took charge of a locomotive engine of defendant, as engineer, at defendant's request, which said engine was pulling a train of cars for the purpose of running the same and the train of cars attached thereto; and was ordered by the defendant to run the same south on its main track from DeSoto, Missouri, through and beyond Blackwell Station. Plaintiff says that, in pursuance of said orders of defendant, said Fred. W. Strottman, on the day aforesaid, was running said engine and said train of cars south over defendant's road; and that at the same time defendant's agents and servants, acting in the line of their duties, were conducting and running an engine and train from beyond Blackwell Station to the north on its road, and that defendant's train-dispatcher, acting in the line of his duties, transmitted an order to defendant's telegraph operator and agent at Blackwell Station, whose duty it was to receive the same and deliver it to defendant's servants in charge of the said north-bound train; that said order required said north-bound train to stop at Blackwell Station and there pass the aforesaid south-bound train; that the aforesaid agent of defendant at Blackwell Station negligently and carelessly failed to deliver said order to defendant's servants in charge of said north-bound train and negligently allowed said train to pass Blackwell Station, and in consequence thereof

and the negligence and carelessness of the agents and servants of defendant, in conducting, managing and directing the movements of said train, the said trains while running at a high rate of speed came into collision, and the said Fred. W. Strottman, without fault on his part, sustained injuries thereby, from which he died on the 24th day of October, 1902. That said collision was caused by the negligence and unskillfulness of defendant's agents, officers and servants, in ordering, managing and directing the movements of said engines and trains, and that by reason thereof the said Fred. W. Strottman was killed.''

The defenses were a general denial (except as to the allegation that defendant was a railway corporation), and a plea of contributory negligence.

The trial before the court and jury resulted in a verdict and judgment in favor of plaintiff for the sum of five thousand dollars. Having duly filed motions for new trial and in arrest, which were overruled, defendant saved exceptions and appealed.

The facts disclosed by the record are but few, and are substantially as follows:

Fred. W. Strottman was at the time of the accident an engineer in the service of defendant, and, as such engineer, in charge of an engine which was pulling out a train of cars at DeSoto, Missouri. He was ordered by defendant to run said engine and train south, on defendant's main track, from DeSoto through and beyond Blackwell Station, a station about nine miles south of DeSoto and situated in St. Francois county, Missouri, and in pursuance of said order he was running said engine and train of cars south over defendant's road. At the same time defendant's agents and servants, acting in the line of their duties, were conducting and running an engine and train from beyond Blackwell Station to the north on its road; and defendant's train-dispatcher, acting in the line of his

duties, transmitted an order to defendant's telegraph operator and agent at Blackwell Station, whose duty it was to deliver the same to defendant's servants in charge of said north-bound train. Said order required said north-bound train to stop on the siding at Blackwell Station; but said operator and agent at Blackwell Station negligently failed to deliver said order to defendant's servants in charge of said north-bound train, and negligently allowed said train to pass Blackwell Station, in consequence whereof and of the negligence and carelessness of the agents and servants of defendant in conducting, managing and directing the movement of said train, the said trains, while running at a high rate of speed, came into collision, and the said Fred. W. Strottman, plaintiff's husband, without fault on his part, sustained injuries thereby from which he died.

At the close of the evidence the defendant asked the court to give an instruction to the jury in the nature of a demurrer to said evidence, which instruction the court refused to give, and the defendant excepted. Thereupon the court, at the instance of plaintiff, and over the objections and exceptions of defendant, gave to the jury the following instructions:

"The court instructs the jury as follows: If you believe from the evidence in the case that on October 22, 1902, Fred. W. Strottman was employed by defendant as a locomotive engineer, and at the time aforesaid, while acting in the line of his duties and under the orders of defendant, he undertook to run an engine and train of cars from DeSoto south over defendant's road to and beyond Blackwell Station, and that while said Fred. W. Strottman was so engaged and in the exercise of ordinary care, a north-bound engine and train of cars in charge of defendant's servants and agents, acting in the line of their duties, was being run and conducted north on defendant's

road from below Blackwell Station, and that defendant's train-dispatcher, acting in the line of his duties, transmitted an order for the agents and servants of defendant in charge of said north-bound train to hold said train at Blackwell to pass the said south-bound train to the defendant's operator and agent at Blackwell Station, and that it was his duty to deliver said order to defendant's servants and agents in charge of said north-bound train, and that defendant's said operator negligently failed to deliver said orders to defendant's agents and servants in charge of its north-bound train, and that in direct consequence thereof, you so find, said trains came into collision and the said Fred. W. Strottman thereby sustained injuries from which he died on the 24th day of October, 1902, and that at the time of his injury and death the plaintiff was his wife, then you will find the issues for the plaintiff.

"If you find the issues for the plaintiff, you will assess her damages at such sum as in your judgment will be a fair and just compensation to plaintiff for the loss of her husband, not exceeding the sum of five thousand dollars."

Defendant insists that plaintiff ought not to have or maintain this action, because:

*First.* The Act of 1897, entitled "Corporations, Railroads" (Laws 1897, p. 96), only creates a cause of action in favor of employees engaged in the operation of railroads, and creates no cause of action in favor of the widow or children of deceased, or other persons.

*Second.* That as the engineer and the telegraph operator were fellow-servants, as that term is defined by section 3 of said Act of 1897, there can be no recovery.

The act is as follows:

"Section 1. That every railroad corporation owning or operating a railroad in this State shall be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof: *Provided,* that it may be shown in defense that the person injured was guilty of negligence contributing as a proximate cause to produce the injury.

"Sec. 2. That all persons engaged in the service of any such railroad corporation doing business in this State, who are entrusted by such corporation with the authority of superintendence, control or command of other persons in the employ or service of such corporation, or with the authority to direct any other servant in the performance of any duty of such servant, or with the duty of inspection or other duty owing by the master to the servant, are vice-principals of such corporation, and are not fellow-servants with such employees.

"Sec. 3. That all persons who are engaged in the common service of such railroad corporation, and who while so engaged are working together at the same time and place, to a common purpose of same grade, neither of such persons being entrusted by such corporation with any superintendence or control over their fellow employees, are fellow-servants with each other: *Provided,* that nothing herein contained shall be so construed as to make any agent or servant of such corporation in the service of such corporation a fellow-servant with any other agent or servant of such corporation engaged in any other department or service of such corporation.

"Sec. 4. No contract made between any railroad corporation and any of its agents or servants, based upon the contingency of the injury or death of any

agent or servant, limiting the liability of such railroad corporation for any damages under the provisions of this act, shall be valid or binding, but all such contracts or agreements shall be null and void.''

The testimony shows that the telegraph operator at Blackwell Station was also defendant's agent at that place, and that his duties as such agent were of a character entirely different from that of his duties as operator; that in the discharge of his duties as agent he was under the control of defendant's superintendent, while in the discharge of his duties as operator he was under the control and direction, and subject alone to the orders, of the train-dispatcher on duty at the time.

It was also shown by the evidence that the engineer, in managing, running and operating the train, was under the control and subject to the orders of the train-dispatcher on duty at the time, as was also the conductor of the train. The operator at Blackwell Station and the engineers of the respective trains were engaged in the common service of defendant. They were employed by a common master, and worked together in a common purpose of the same grade. Neither of them had any control or superintendence over the other; they were in the same department or service of the company, and were clearly fellow-servants within the meaning of section 3, supra.

Plaintiff, however, contends that the engineer and telegraph operator were not fellow-servants, and that even though they were, the defendant would still be liable in damages, under the provisions of section 1 of the act, for the death of engineer Strottman.

In Smith v. Railroad, 92 Mo. 359, it is held that a train-dispatcher of a railroad, who has the control of the movement of its trains, and to whose orders the conductors and engineers are subject, is the representative of the company, and is not a fellow-servant

with those engaged in operating and moving the trains.
[Edge v. Railroad, 206 Mo. 471; Railroad v. Clark,
57 Fed. 125.]

A leading case upon this subject is Railroad v.
Camp, 65 Fed. 952, in which it was held that a tele-
graph operator at a station on the line of a railroad,
whose duty it is to receive telegraphic orders relative
to the movement of trains from the train-dispatcher at'
another place, and communicate them to the engineers
and conductors of trains at his station, is not the super-
ior, but the fellow-servant, of the engineer of a train
on such railroad, both at common law and under the
statutes of Ohio. TAFT, Circuit Judge, speaking for
the court, said: "It is argued that the telegraph
operator is not a fellow-servant of the conductor and
engineer within the common-law rule. We think he is.
He and the engineer and the conductor work together,
at the same time and place, for a common employer,
with an immediate common object, namely, the proper
running of trains. It is essential, in the operating
department of a railroad company, that there should
be provision for communicating to those in charge of
different trains the whereabouts of other trains, to
avoid collision. This information is given by means
of the general time-table and general rules for the
running of trains with reference to each other, which
the employees in charge of each train are obliged im-
plicitly to obey. But it often happens that the gen-
eral time-table must be varied from, and these varia-
tions must be communicated to those in charge of
trains. This is effected usually by telegraphic orders
from the superintendent or the train-dispatcher, who
has supreme control of the running of trains. The
information is also communicated by means of flag-
men, by means of torpedoes, by red lights and green
lights upon trains, by the block-signal system, and
in other ways. The subordinate employees, whose duty

it is to transmit the orders of the officer in control, or to give information as to the presence of trains upon any part of the track, without special orders, are engaged at the same time and place with the persons operating the train, in a common employment, having an immediate, common object, namely, that of the running of trains, and therefore are fellow-servants. The man who makes the signal at the station to the engineer on the approaching train to stop is as much engaged in the running and operation of that train as the flagman sent out ahead to signal the condition of a switch. Neither exercises the discretion or the judgment or the control of the master, but each contributes his part to the safe running of the train. There can be no separation of the signal department and the operating department, for the employees engaged upon the train, in the actual, manual operation of the train, are expected to be part of the signal department of the company. The man who puts out the green light at the back of the train, to indicate that a train is following, communicates to every station agent, every conductor, and every engineer, who sees it, knowledge upon which they, each of them, must act, and yet it can hardly be said that the brakeman, in displaying this green light, is acting in a different department from the man who opens and closes the throttle valve of the engine. The principles which must govern in this case were first announced by the Supreme Court of the United States in Randall v. Railroad, 109 U. S. 478. In that case a brakeman working a switch for his train on one track in the railroad yard was injured by the negligence of the engineman of another train, in driving his engine too fast, and in not giving due notice of its approach. It was held that the two were fellow-servants. Said Mr. Justice GRAY, delivering the opinion of the court: "They are employed and paid by the same master.

The duties of the two bring them to work at the same place at the same time, so that the negligence of the one in doing his work may injure the other in doing his work. Their separate services have an immediate, common object in the moving of the trains. Neither works under the orders or control of the other. Each, by entering into his contract of service, takes the risk of the negligence of the other in performing his service; and neither can maintain an action for an injury caused by such negligence against the corporation, their common master.' Every word of this passage has application to the relation existing between the engineman of the train and a telegraph operator charged with the duty of signaling the engineman. Among the cases cited by Mr. Justice GRAY is that of Slater v. Jewett, 85 N. Y. 61, where it was expressly held by the Court of Appeals of New York that a telegraph operator and a fireman upon an engine were fellow-servants, so that the fireman could not hold the railway company liable for an injury caused by the negligence of the telegraph operator in transmitting a dispatch giving orders to the engineer." Later, in the same opinion, it is said: "In several of the cases already cited to sustain the view that a train-dispatcher is not a fellow-servant of a conductor or engineer, a clear distinction is made between the telegraph operator and the train-dispatcher, by which the former is placed in the category of all subordinate employees with the engineman and conductor, and is held to be a fellow-servant with them. Such is the holding in Slater v. Jewett, 85 N. Y. 61, already referred to, and the propriety of it has been recognized in all subsequent New York cases, and distinctly approved in Sutherland v. Railroad, 125 N. Y. 737, better reported in 26 N. E. 609. The same distinction is recognized in Reiser v. Railroad, 152 Pa. St. 38, 25 Atl. 175, and in McKaig v. Railroad, 42

Fed. 288. A different view, it is true, has been taken in Railroad v. DeArmond, 86 Tenn. 73, 5 S. W. 600, and in Madden's Admr. v. Railroad, 28 W. Va. 610. But in these two states the different department theory prevails, and is the basis of the decision in each case. The different department exception to the fellow-servant rule, as we have seen, has been much limited by the Supreme Court of the United States in its last utterance upon the subject, and the authorities of West Virginia and Tennessee are therein expressly dissented from. In the case of Railroad v. Charless, 2 C. C. A. 386, 51 Fed. 562, the Circuit Court of Appeals of the Ninth circuit held that a telegraph operator, under the averments of the petition in. that case, was not a fellow-servant of a train employee injured by his negligence. This decision by the Ninth circuit has been considered by us, as may be seen by reference to Judge Barr's opinion in the Clark case, already referred to. And only. one sentence need be added. to the comment there made. The court of the Ninth circuit relies on the decision of Lewis v. Seifert, 116 Pa. St. 628, 11 Atl. 514, to sustain its conclusion. That case only decided that the train-dispatcher was not a fellow-servant of the conductor or engineer injured by his negligence. The court below had also charged that the .telegraph operator was a fellow-servant. But it did not become necessary for the Supreme Court of Pennsylvania then to pass upon the correctness of the charge of the court on this point. Subsequently, however, in the case of Reiser v. Railroad, 152 Pa. St. 38, 25 Atl. 175, this question arose squarely, and was decided as already stated, and contrary to the conclusion reached in the Charless case.''

In the case of Frost v. Railroad, 69 Fed. 936, KNOWLES, District Judge, refused to follow the Camp case, and held that, when an engineer on the defendant railway company's road had been killed in a col-

lision, caused by the negligent omission of a telegraph operator to transmit the order of the train-dispatcher relative to the change of running time, the defendant railway company could not escape liability on the ground that the engineer and telegraph operator were fellow-servants. The case was thereafter taken to the Circuit Court of Appeals for the Ninth circuit, by writ of error, where the judgment of the court below was reversed. The court followed the Camp case, and held that a telegraph operator at a station on the line of a railroad who receives and delivers the orders of the train-dispatcher in respect to the movement of trains, is the fellow-servant of the employees of the railroad company in charge of the train, and that such employees, if injured in consequence of the negligence of the telegraph operator, cannot recover damages from the railroad company.

In Reiser v. Railroad, 152 Pa. St. 38, it is held that a fireman of a locomotive and a station agent who is also a telegraph operator are fellow-servants within the rule that an employer is not liable to an employee for an injury caused by the negligence of a fellow-servant.

So in the case of McKaig v. Railroad, 42 Fed. 288, it was held by Nelson, J., District Judge of Massachusetts, that a telegraph operator employed by a railroad company to give information in regard to the location of trains on the road, and to communicate to the operators on the trains instructions for running them, received by him from the train-dispatcher, is a fellow-servant of the fireman on such trains.

Upon the same subject, see Edge v. Railroad, supra, and authorities cited.

As sustaining the position that the telegraph operator and the deceased engineer were not fellow-servants plaintiff relies chiefly upon the case of Railroad v. Furry, 114 Fed. 898, but that case is bottomed

upon the statute of Arkansas, by which the different department doctrine is established, and, is, therefore, not in point.

Judge Elliott, in discussing the subject of Fellow-Servants, in his work on Railroads (2 Ed.), vol. 3, sec. 1328, says: "It is a matter of which judicial notice is taken that, in operating a railroad, the services of telegraph operators and signalmen are required, and, as it seems to us, judicial notice must also extend to the fact that the class of employees named are ordinarily employed in matters of detail. The courts are by no means agreed upon the question whether telegraph operators are vice-principals or fellow-servants. Many cases affirm that they are vice-principals, while many others assert that they are not. It is, we know, somewhat bold to venture an opinion upon a question upon which the authorities fight so stubbornly, but, nevertheless, we briefly state our views upon the question. It seems to us that telegraph operators are employees engaged in performing duties connected with the detail work of operating a railroad, and are not entrusted with the duties devolved by law upon the master, and that they are engaged under a common master in a common employment, that of moving trains upon the road. As well say that persons in charge of telephones over which directions are given in a large manufacturing establishment are vice-principals as that telegraph operators are vice-principals. They cannot be regarded as vice-principals without violating the settled rule that the master's duty does not extend to the details of the work of the common employment, nor without violating the rule that he only is a vice-principal to whom a duty resting on the master is entrusted. There is no more reason for holding that the master's duty is to see that every telegraphic direction is correctly transmitted than there is for holding that the master must see that every verbal

direction given by a switchman, conductor or brake-
man regarding the opening or closing of a switch is
correctly worded. Our conclusion is that where the
master exercises ordinary care in selecting competent
telegraphic operators he is not liable to an employee
injured by reason of their negligence. All the analo-
gous cases support this conclusion, for, with very rare
exceptions, it is held that matters of detail concerning
the operation of a railroad pertain to the duties of
employees and are not duties of the employer. A
train-dispatcher who has general charge of the move-
ments of the trains occupies a different position from
telegraph operators who assist in the details connected
with the movements of trains. In some of the cases
a distinction is made between signalmen or flagmen
and telegraph operators, but we deferentially submit
that there is no solid basis for the distinction. It can-
not be justly held that telegraph operators whose duty
it is to transmit orders or give signals are superior
agents, for they do not command, inasmuch as they
simply transmit telegraphic orders, and in doing this
no more discharge the master's duty than do ordinary
signalmen or flagmen.''

While there is some conflict in the authorities, the
decided weight is to the effect that telegraph operators,
engineers, conductors, and all other employees of a
railroad company engaged in performing duties con-
nected with the detail work of operating a railroad,
and working together at the same time to a common
purpose of the same grade, as were the telegraph
operator and engineer at the time of the accident in
this case, are fellow-servants.

In view of the authorities alluded to, and the con-
siderations stated, the telegraph operator, in our judg-
ment, was at common law the fellow-servant of engi-
neer Strottman. But were there even the shadow of
a doubt upon this question, it is put to rest by section

3 of said act, by which it is expressly provided "that *all* persons who are engaged in the common service of such railroad corporation, and while so engaged are working together at the same time and place to a common purpose of same grade, neither of such persons being entrusted by such corporation with any superintendence or control over their fellow employees, are fellow-servants with each other."

With respect to the other proposition, it may be said that if section 1 of the act stood alone, it is clear that plaintiff could not maintain this action. Standing alone, this section would make a railroad company liable in damages for injury to any of its employees engaged in the operation of its road, in the absence of contributory negligence on their part; in fact, an insurer of all persons thus employed, regardless of the kind of service, against injury sustained by reason of the negligence of any other agent or servant of such railroad, and this, too, regardless of the fact that the agent or servant whose negligence causes the injury might, at the time, be engaged in some business entirely foreign to or different from the operation of the railroad. But section 1 of said act is not an independent statute, and must be read and construed with the other sections *in pari materia*. The second section of the act, defining vice-principals, would have no proper place in the act or statutes if it was intended by the first section to create an absolute liability upon the part of a railroad corporation for the negligence of any employee, regardless of his relations to the company or his co-employees. The persons described in said section 2 are those who act for the principals; they are vice-principals, and it is declared in the act that they are "not fellow-servants with such employees."

It is apparent, from the reading of the act, that it was not the purpose of the Legislature to make the

first section a complete enactment within itself, for if that were the intention, there is no reason why "vice-principals" should be defined, and no reason for declaring that such are not "fellow-servants." The evident purpose in describing them was that they might not be confounded with "fellow-servants" as mentioned in section 3 of the act. For their wrongful-or negligent acts towards other servants who are by reason thereof injured, said section 3, in effect, provides that railroad corporations shall be liable, and it also defines the fellow-servants for whose acts, resulting in injury to other fellow-servants, the railroad companies are not to be held liable.

If the first section of the act be construed alone it is apparent that all distinctions between employees are destroyed; but that this was not the purpose of the Legislature is manifest from the fact that sections two and three make such distinctions, and define who are and who are not fellow-servants.

There is no more reason for ignoring section 3 of the act than there is for ignoring section 1, and they must be construed together, and effect given to all the provisions of the act if possible. [Riddick v. Walsh, 15 Mo. 519.] This is a cardinal rule in the construction of statutes. Thus, in Macke v. Byrd, 131 Mo. l. c. 690, it is said: "All provisions of law on one topic should be considered in determining the meaning of any particular portion thereof, and such a construction should be given to the portion under consideration as will keep all the provisions of law on the same subject in harmony and give effect to all." And again, in Litson v. Smith, 68 Mo. App. l. c. 403, "In construction of a statute all of its parts are to be construed together, and not one part only, by itself." If possible, it should be so construed as to avoid a conflict between the different parts. [City of Westport ex rel. Tomb v. Jackson, 69 Mo. App. 148.] "Where

the provisions of a law are inconsistent and contradictory to each other, or the literal construction of a single section would conflict with every other following or preceding it, and with the entire scope and manifest intent of the act, it is the duty of the courts, if it be possible, to harmonize the various provisions with each other, and, to effect this, it may be necessary to depart from a literal construction of one or more sections." [State to use of Rosenblatt v. Heman, 70 Mo. l. c. 451.] "The language of an act should be construed in view of its title and its lawful purpose." [2 Lewis's Suth. Stat. Construction (2 Ed.), sec. 341.] In Connell v. Western Union Tel. Co., 108 Mo. 459, it is held: "A penal statute must be so construed that no case will fall within it which is not included within the reasonable meaning of its terms and within the spirit and scope of its enactment." To the same effect is Sedalia ex rel. Taylor v. Smith, 206 Mo. 346. The Court of Appeals of Kentucky, speaking of the title of an act, says: "It is essentially a part of the act, not only because it has been selected and adopted by the Legislature as one of the tests of their meaning as expressed in the bill, but because the Constitution has made it a part, and the controlling part, of the law to which it applies. It is, therefore, not only useful in affording a fair index of the legislative intent, in case of ambiguity in the context, but it must be read in connection with the remainder of the act, as a part of it, in determining what is the law." [Com. v. Barney, 24 Ky. L. R. 2352.]

The title to the act is as follows: "An Act to define the liabilities of railroad corporations in relation to damages sustained by their employees, and to define who are fellow-servants and who are not fellow-servants, and to prohibit contracts limiting liability under this act." It is indicated by this title that the purpose of the act was to create a new cause of action;

that is, a liability on the part of a railroad company for damages to its employees by reason of the negligence of a fellow-servant while engaged in the work of operating such railroad. When section 1 of the act is construed in connection with section 3, as it should be, full force and effect may be given to both said sections, and unless they be taken together and construed in connection with each other, no action can be maintained under section 3 or under the act, because no remedy is provided for by either section two or three.

Defendant also contends that as plaintiff's husband and the telegraph operator were fellow-servants, the defendant is not liable at common law, and, further, that as section 1 of said act gives a right of action, for personal injuries, to the servant of the company only, and not to his widow, in case of his death from such injuries, as provided for by sections 2864 and 2865, Revised Statutes 1899, plaintiff cannot recover.

That plaintiff could not recover at common law is beyond any question, and she must look to the statutes of this State for authority to maintain an action against the company.

Plaintiff does not contend that section 1, supra, makes the action for death survive to the widow, within the meaning of the word "survive" as used in some jurisdictions, where the action for suffering and pain suffered by the deceased can be maintained by the representatives of the deceased; but contends that the intention of the Legislature in enacting said section was to make railroads liable for all damages sustained by fellow-servants engaged in the work of operating the railroad; that is to say, in case the servant sustained personal injury, he could bring a common law action for damages; and in case of the death of the servant, the railroad would be liable for damages as provided by sections 2864, 2865 and 2866, Re-

vised Statutes 1899. Plaintiff also relies upon Philo v. Railroad, 33 Iowa 50, and Gumz, Admrx., v. Railroad, 52 Wis. 672, as holding that under fellow-servant laws enacted in the same manner as the Act of 1897, the action survives in accordance with the provisions of the general statutes of the State allowing a recovery for death by wrongful act. But the ruling in the Philo case is bottomed upon a statute of that State which makes the perpetrator of the act resulting in death liable for the injury, and provides that the action may be brought by the representatives of the deceased, and secures the amount recovered to the wife, children or parents of the deceased. The Gumz case is based upon a similar statute.

Section 2865, Revised Statutes 1899, is as follows: "Whenever the death of a person shall be caused by a wrongful act, neglect or default of another, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured."

We are unable to agree that this section has the effect of transmitting a right of action created by section one of the Act of 1897, as it has been ruled by this court that that section does not include a claim for damages for injuries occasioned by the negligence of a fellow-servant. [Proctor v. Railroad, 64 Mo. 112; Miller v. Railroad, 109 Mo. 350; Sherrin v. Railroad, 103 Mo. 378.] At the time of, and prior to, the passage of the Act of 1897, supra, Strottman would have had no cause of action because his injury was caused by the negligence of a fellow-servant, and it cannot be seriously contended that section 2865 has the effect of transmitting a cause of action originating under

section 1 of the Fellow-Servant Act. The purpose of section 2865 was to transmit a right of action which, but for the provisions of such section, would have ceased to exist upon the death of the injured party. It does not create a new cause of action, but simply transmits one that did exist, and as Strottman's cause of action, under the provisions of said section 1, ceased to exist after his death it is difficult to see how a nonexistent cause of action can be transmitted.

Nor did section 2864, Revised Statutes 1899, have the effect of creating a cause of action when the death of a servant or employee is occasioned by the negligence of a fellow-servant or employee, and clearly it was not intended by the lawmakers to transmit a cause of action to the representatives of the deceased where the injury for which damages are claimed was caused by the negligence of a fellow-servant. [Proctor v. Railroad, supra.]

It will be presumed that the Legislature, at the time of the passage of the Act of 1897, was familiar with the decisions of the Supreme Court, which hold that, under section 2865, supra, the master cannot be held for injuries received by one servant through the negligence and *unskillfulness* of his fellow-servant. Had the Legislature desired to transmit a right of action to the representative of the deceased employee, it could have done so by proper and necessary legislation.

In Sutherland on Stat. Const., sec. 333, it is said: "It is presumed that the Legislature is acquainted with the law; that it has a knowledge of the state of it upon the subjects upon which it legislates; that it is informed of previous legislation and the construction it has received. . . . A judicial construction of a statute of long standing has force as a precedent from the presumption that the Legislature is aware of it, and its silence is a tacit admission that such

construction is correct. The re-enactment of a statute after a judicial construction of its meaning is to be regarded as a legislative adoption of the statute as thus construed. So, where the terms of a statute which has received a judicial construction are used in a later statute, whether passed by the Legislature of the same State or country, or by that of another, that construction is to be given to the later statute; for if it were intended to exclude any known construction of a previous statute, the legal presumption is that its terms would be so changed as to effectuate that intention." [McKay v. Minner, 154 Mo. 608.]

"Where a statute creates a new right or imposes a new duty or liability unknown to the common law, and at the same time gives a remedy for its enforcement, the remedy so prescribed is exclusive. If no remedy is prescribed, the right or liability may be enforced by the appropriate remedy already provided." [2 Lewis' Suth. Stat. Const., sec. 720; Railroad v. Wells, 104 Tenn. 706.] By the first section of the Act of 1897 a remedy is given to the injured fellow-servant, and such remedy is, therefore, exclusive. It is not contended that said section does not provide a remedy for the injured party; and the mere fact that it does not confer such right on the wife or children is conclusive that no such right was intended.

Nothing is better settled in this State than that prior to the passage of the Act of 1897 there was no statute in force in this State which imposed a liability upon a railroad company in favor of the widow for the death of her husband, who was at the time of his death an employee of such company, and was killed by reason of the negligence of a fellow-servant; nor does that act, in our opinion, confer such right. Said act says not a word about a right of action in case of the death of the employee, but by the first section of the act a right of action is created in favor of the

party injured, and no other. The mere fact that the act was incorporated in the revision of 1899, and therein numbered by the revising committee as sections 2873, 2874, 2875 and 2876, did not add anything to its force or effect. In passing upon a similar question in Paddock v. Railroad, 155 Mo. l. c. 536, this court said: "Sections 2590 and 2591, as also sections 2593 to 2597, inclusive, of the Revised Statutes 1889, as above shown, are exactly the same as the laws of March 31st and March 23d, respectively, and therefore those sections must be treated, under this legislative direction, as mere continuations of those laws and not as new enactments. They were entirely different laws before and they continued to be different notwithstanding they were carried into the Revised Statutes and placed in the same article of the same chapter of the Revised Statutes, and notwithstanding that they may appear in the bill enacted by the Thirty-fifth General Assembly which revised chapter 42. This has been the uniform ruling of this court on this question. [St. Louis v. Alexander, 23 Mo. 483; Cape Girardeau v. Riley, 52 Mo. loc. cit. 428; State ex rel. Attorney-General v. Heidorn, 74 Mo. 410; Pool v. Brown, 98 Mo. loc. cit. 680.]"

Powell v. Sherwood, 162 Mo. 612, was an action by the widow of Powell against Sherwood, receiver of the railroad company, for damages, under the Act of 1897, for the death of her husband which was occasioned by the negligence of a fellow-servant while in the service of the railroad company. But the question as to the right of the widow to maintain the action under the Act of 1897 was neither raised nor passed upon in that case, nor has it ever been passed upon by this court. And while, as has been said, "where a statute creates a new right or imposes a new duty or liability unknown to the common law, . . . if no remedy

is provided, the right or liability may be enforced by the appropriate remedy already provided," that rule cannot be applied, or is unavailing, in this case, for the reason that at the time of the death of plaintiff's husband there was no statute in force in this State, nor was there until the passage of the Act of April 13, 1905, to amend section 2864 of chapter 17, Revised Statutes 1899, which authorizes a recovery by an employee, servant or agent of the railroad company for injuries sustained by him by reason of the negligence of a fellow-servant. There could, therefore have been no appropriate remedy at the time of the accident. The passage of the Act of 1905 tends to show that it was the opinion of the lawmakers that no such right existed prior to that time; otherwise, there was no occasion for its passage.

The Act of 1897 is complete within itself, and not amendatory of any other act or statute. It confers authority only upon the servant injured to maintain the action, and not even by implication does it confer such right upon the widow of such servant, in which respect it differs from a statute which creates a right of action but designates no particular person who may avail himself of such right.

The statutes in question, being in derogation of the common law, must be strictly construed, and when this is done, there is no escaping the conclusion that they do not confer upon the plaintiff the right to maintain this action.

Our conclusion is that the judgment should be reversed. It is so ordered. *Fox* and *Graves, JJ.*, concur; *Woodson, J.*, concurs in a separate opinion; *Gantt, C. J., Valliant* and *Lamm, JJ.*, dissent.

## SEPARATE CONCURRING OPINION.

WOODSON, J.—This case was first argued and submitted in Division No. 2, and it was by that court transferred to Court In Banc, where it was again argued and submitted, prior to the time the writer became a member of this court. The cause fell to the lot of BURGESS, J., and he wrote an opinion therein, in which Fox and GRAVES, JJ., concur; but GANTT, C. J., and VALLIANT and LAMM, JJ., dissented therefrom. This equal division of the judges necessitated my taking an interest in the case. The case was argued In Banc at this January call of the docket.

There has been so much said and written about this case that there remains but little, if anything, to be said upon the subject. All I can hope to do is to touch upon the salient points in the case, and briefly express my views thereof, without attempting to cover the entire ground, which has been so ably and exhaustively considered by the two opinions written herein; nor will I attempt to restate the facts of the case, because that has been admirably done by BURGESS, J., in his opinion, which all concede to be a full and fair statement of the facts.

I. The defendant insists the plaintiff is not entitled to recover in this action, for the reasons:

*First.* Because Strottman, the deceased engineer, and the telegraph operator at Blackwell were fellow-servants, and that at common law the master was not liable for the injuries received by a servant in consequence of the negligence of a fellow-servant.

*Second.* Because the Act of 1897 (Laws 1897, p. 96), entitled, "Corporations, Railroads," creates a cause of action only in favor of the injured employee, and does not transmit that cause of action to his widow or children in case of death.

This calls for a construction of that act, which reads as follows:

"Section 1. That every railroad corporation owning or operating a railroad in this State shall be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof: Provided, that it may be shown in defense that the person injured was guilty of negligence contributing as a proximate cause to produce the injury.

"Sec. 2. That all persons engaged in the service of any such railroad corporation doing business in this State, who are entrusted by such corporation with the authority of superintendence, control or command of other persons in the employ or service of such corporation, or with the authority to direct any other servant in the performance of any duty of such servant, or with the duty of inspection or other duty owing by the master to the servant, are vice-principals of such corporation, and are not fellow-servants with such employees.

"Sec. 3. That all persons who are engaged in the common service of such railroad corporation, and who while so engaged are working together at the same time and place, to a common purpose of same grade, neither of such persons being entrusted by such corporation with any superintendence or control over their fellow-employees, are fellow-servants with each other: Provided, that nothing herein contained shall be so construed as to make any agent or servant of such corporation in the service of such corporation a fellow-servant with any other agent or servant of such corporation engaged in any other department or service of such corporation."

The first duty devolved upon us is to determine

whether or not the engineer and the telegraph operator were fellow-servants at the time the former was killed.

This question has been so ably and exhaustively considered by BURGESS and LAMM, JJ., in their respective opinions herein that there is but little remaining for me to say upon the subject. I will, however, add a few observations to what has been said by them. I will first consider the proposition from a common law standpoint, and then view it in the light of the Act of 1897.

This precise question came before Division No. 2 of this court in the case of Edge v. Railroad, 206 Mo. 471. The facts in that case were as follows:

On August 17, 1903, the defendant was operating a single-track railway between Carthage, in this State, and Galena, in the State of Kansas, a distance of thirty or thirty-five miles. Carterville, Webb City and Joplin are on the road, and between Carthage and Galena. There were some eight or ten cars operated over said road, and the service was one about every thirty minutes. The company maintained a general office at Webb City, in which it employed two car-dispatchers, one named T. A. Harbaugh, and the other Lawrence Havens. The former served from sometime in the forenoon to three o'clock p. m., when he was relieved by the latter, who performed the duties of the position for the balance of the day. The company had some twelve or fifteen switches, or side tracks, between Carthage and Joplin, on which the cars going in opposite directions passed each other. At most, if not all, of those switches there was a telephone maintained and used by the defendant as its telephone system. These telephones were connected with the office of the car-dispatcher at Webb City. The cars were numbered, and the mode of operating them was as prescribed by a rule of the company, which is as follows: "(10). Cars must be run as closely to schedule time as pos-

sible, and each conductor must communicate, by telephone, with the car-dispatcher at time of leaving carhouse and at each passing point and terminal wherever there is a telephone, and must govern the movement of his car strictly by orders received from dispatcher, proceeding from station to station only on orders. He must not allow his car to go beyond any meeting point without orders, whether he meet another car or not. When the cars meet the conductor of the car first to arrive will report, and repeat orders, received, to both his own motorman and conductor of connecting car, and motorman of latter must not proceed until ordered or signaled so to do by his conductor. No extra car or work-car must leave car-house without reporting to and receiving orders from dispatcher, and all such cars must move only in accordance with orders received from dispatcher. Orders received at telephone must be repeated back to dispatcher and conductor should then keep his ear to 'phone for a moment to hear anything further that the dispatcher may have to say to him. Orders must not be shouted between passing cars. Each car must receive its own orders over 'phones unless both cars meet and are standing in front of 'phone when orders are given. When a telephone is out of order and orders cannot be obtained over it, both cars will proceed carefully to the nearest telephone and call for orders.'' At the time of the injury plaintiff was in the employment of the defendant as a motorman, and had charge of car No. 30, which left Carthage at 2:10 of the afternoon of that day on its regular trip. Buren Moad was also an employee of the company, and was the conductor in charge of that car at the time of the injury. When the car left Carthage, the conductor, Moad, called up the dispatcher and received orders to go to Morgan Station, which was a station about three miles from Carthage. The car arrived there on time, and the conductor called,

by 'phone, the dispatchers for orders.  After the car left Carthage, and before reaching Morgan, Harbaugh, one of the car-dispatchers, went off duty, but remained in the office, and Havens, the other dispatcher, answered the telephone at Morgan.  The last order Harbaugh gave before going off duty was for car No. 29, which was *en route* from Galena to Carthage, and which had arrived at the station Motley, about five miles west of Morgan, to proceed to Morgan, which was a regular place where it should have met car No. 30.  That was the last order given by Harbaugh; and the first given by Havens, after coming on duty, was to Conductor Moad when he called in at Morgan.  Moad, over the objections of defendant, testified that when he reached Morgan he called the dispatcher for orders, and that "Havens said, 'Hello!' and I said, '30 Morgan,' and he says, '30 pass 29 at Syracuse; look out for 17 at Lakeside.  I don't know whether they are on the main track or not, but they are coming ahead of you, and you will then come on to Motley'; and I repeated the order back—said: '30 pass 29 at Syracuse; look out for 17 at Lakeside.  Don't know whether they are on the main track or not, but they are coming ahead of you, and come on to Motley.'  Havens said, 'All right,' or something like that."  He also testified that he then boarded his car and gave the signal to go ahead, and walked to the front of the car and repeated the order to the motorman, and he said: "All right; we'll do it." . . . . As soon as the signal was given the car proceeded toward Syracuse, which is a mile or so west of Morgan.  After plaintiff's car curved to the south and started back upgrade on the curve to the north, the power was turned on, and the car was going from twenty-five to thirty-five miles an hour.  On the south side of the track of the Ropp land was a row of fruit trees, six or eight feet from the track, the limbs of which extended out to or near the

passing cars.  The plaintiff's evidence tended to show
that cars meeting each other on said track as it makes
the curve to the north could not have been seen on
account of said curve and said trees, on the day of the
injury, by the motorman, if standing at his post of
duty on the front end of the car, for a greater dis-
tance than 150 to 200 feet, while defendant's evidence
tended to show that it could have been seen from one
hundred and fifty to nine hundred feet.  About the
time car No. 30 reached the top of the grade mentioned,
and while going from twenty-five to thirty-five miles
an hour, car No. 29 came east from Motley, around the
curve and from beyond the trees, at a rate of speed
from twenty to thirty miles an hour.  When No. 29
was first seen by plaintiff, the evidence tended to
show it was somewhere between one hundred and fifty
and two hundred feet away.  He testified that he was
looking down the track all the time, and as soon as he
saw the car he reversed his car and attempted to apply
the brake, but, believing a collision was inevitable, he
leaped from the car and received the injuries com-
plained of.

The plaintiff's chief contention in that case was,
that the car-dispatcher was a vice-principal of defend-
ant company, and, as such, had full charge and control
of the cars and the employees in charge thereof, as well
as their movements; while upon the other hand, the
defendant contended the dispatcher was a fellow-ser-
vant of plaintiff and was only delivering orders to the
employees in charge of the cars, where to pass each
other.  In the discussion of that question the unani-
mous court, speaking through BURGESS, J., on page
490, said:  "The undisputed facts are, the car-dis-
patcher, whose office was at Webb City, had not only
control of the plaintiff, but he had control of all the
conductors, and motormen, of all the cars and their op-
eration."  Upon those facts the court held, and, in my

judgment, properly so, that the car-dispatcher was a vice-principal, and that the company was liable for his negligence. But in disposing of the defendant's contention, that the dispatcher was but a telephone operator, Judge Burgess, on page 497, said: " 'A distinction is to be drawn between mere telegraph operators and train-dispatchers, as well as the other employees of a railroad. A telegraph operator ordinarily is not invested with any control over the running of trains, and it has been held that a telegraph operator does not occupy the position of a train-dispatcher merely because he transmits or delivers orders for the movement of trains, and that his negligence cannot be said to be the negligence of the company.' [12 Am. and Eng. Ency. Law (2 Ed.), 968.]" That enunciation of the law by Judge Burgess is sustained by the following cases, some of which are in addition to the authorities cited by him: McKaig v. Railroad, 42 Fed. 288; Railroad v. Clark, 57 Fed. 125, 16 U. S. App. 17; Railroad v. Camp, 65 Fed. 952, 31 U. S. App. 213; Railroad v. Frost, 74 Fed. 965, 44 U. S. App. 606; Price v. Railroad, 145 U. S. 651; Slater v. Jewett, 85 N. Y. 61; Dana v. Railroad, 23 Hun (N. Y.) 473; Monaghan v. Railroad, 45 Hun (N. Y.) 113; Reiser v. Railroad, 152 Pa. St. 38.

There is not a scintilla of evidence to be found in this record which tends to show that the telegraph operator at Blackwell had any authority or control whatever over the movement of defendant's trains, or over any of its employees in charge thereof. Under this state of facts, according to the law as stated in the Edge case, supra, and the authorities before cited, the telegraph operator and Strottman were fellow-servants according to the common law rule. [Koerner v. St. Louis Car Co., 209 Mo. 141.]

We will next consider whether or not that relation between them was changed by the Act of 1897.

It cannot be logically contended that section two of that act constituted the telegraph operator a vice-principal of the defendant company, for the reason that it only declares those employees of the company to be vice-principals "who are entrusted by such corporation with the authority of superintendence, control or command of other persons in the employ or service of such corporations, or with authority to direct any other servant in the performance of any duty of such servant, or with the duty of inspection or other duty owing by the master to the servant." This record totally fails to disclose any authority whatever entrusted by the defendant to the telegraph operator at Blackwell to superintend, control or command any person in its employ, or to direct any such employee in the performance of his duty as such servant, or to perform any other duty owing by the master to the servant. In the absence of any such showing, it must be presumed that he had no such authority conferred upon him, and it must, therefore, be held that he was not a vice-principal of the defendant company. This conclusion seems to me to be almost self-evident.

The interpretation we have placed upon section two of said act is strengthened and made clearer by reading in connection with it section three of the act. The latter section declares "all persons who are engaged in the common service of such railroad corporations, and who while so engaged are working together at the same time and place, to a common purpose of same grade," and not entrusted with any of the powers or duties stated in section two, to be fellow-servants. The evidence in this case is undisputed and conclusively shows that the telegraph operator at Blackwell, and the engineer, Strottman, were, at the time the negligence complained of occurred, engaged in a common service—the movement and operation of defendant's trains, and that they were working to-

gether at the same time and place, and to a common purpose of the same grade, and the former had no authority or control over the latter, as stated in section two. Section three of the act is but declaratory of the departmental doctrine so often considered by this court, and so fully and ably expounded by GANTT, C. J., in the case of Koerner v. St. Louis Car Co., supra.

II. Having determined in paragraph one of this opinion that the telegraph operator and Strottman were fellow-servants, it next becomes our duty to decide whether or not the cause of action given by the Act of 1897 to Strottman against the defendant survived to his widow after his death. The defendant contends that the cause of action was personal to Strottman and that it abated at his death. It is conceded by all parties that the Act of 1897 does not transmit the cause of action to the wife and children where death ensues; but plaintiff insists that the cause of action created by that act, in favor of her husband, was transmitted to her by virtue of sections 2864 and 2865, Revised Statutes 1899.

At common law the master was not liable to his servant for injuries received by him in consequence of the negligence of a fellow-servant; nor was that law changed by sections 2864 and 2865, Revised Statutes 1899. Neither he, if he had survived the injury, nor his widow or children, in case of his death, could recover damages for such injuries. By the latter section it was only intended to transmit a cause of action to the widow and children which existed in favor of the deceased at the time of his death; but since the servant never at any time had a cause of action against the master for injuries received through the negligence of a fellow-servant, this court has many times held that where death of the servant ensued there was no cause of action to be transmitted to his widow and children,

and for that reason they could not recover. [Proctor v. Railroad, 64 Mo. 112.]

Counsel for plaintiff does not dispute the law to be as above stated; but contends most earnestly that when the Act of 1897, now section 2873, Revised Statutes 1899, was enacted, a cause of action in favor of the servant against the master for injuries received in consequence of the negligence of a fellow-servant, was created, and that where death ensued, that cause of action was transmitted to the widow and children by virtue of section 2865. In support of that proposition, counsel for plaintiff cite and rely upon that class of cases which hold that the cause of action created by statute or ordinance in favor of third persons against the master for injuries received through the negligent acts of his servant survive and are transmitted by section 2865 to their widows and minor children. Among the cases cited are the following: Kenney v. Railroad, 105 Mo. 270; Crumpley v. Railroad, 98 Mo. 34; King v. Railroad, 98 Mo. 235; McQuade v. Railroad, 200 Mo. 157; Higgins v. Railroad, 197 Mo. 300; Jackson v. Railroad, 157 Mo. 621; Riska v. Railroad, 180 Mo. 168; Wendler v. House Fur. Co., 165 Mo. 541; Yale v. Gillham, 187 Mo. 393; Lore v. Mfg. Co., 160 Mo. 608.

It seems to me that that is a clear misconception of those cases. In my judgment they have no application whatever to the case at bar. This error, evidently, grows out of an erroneous assumption that negligence constitutes a cause of action. Clearly, that is not true, because the cause of action is the violation of plaintiff's rights which result in his injury, and the negligent acts are but the means by which those rights are infringed upon. And it is equally true that before negligent acts are actionable, there must be a legal duty resting upon one person in favor of another; and it is the negligent disregard of those legal

Strottman v. Railroad.

duties which violate those corresponding legal rights, and if as a result thereof an injury ensues, then a cause of action is given by the law to the injured party. So, it is thus seen that it is the breach of that duty that violates the plaintiff's rights and gives him a cause of action against the defendant; and it is wholly immaterial whether those correlative duties and rights are created and imposed by the commn law, or by a statute of the State, or by an ordinance of a city. If the defendant in person, or by his agent or servant, acting within the scope of his employment, negligently disregards any of those duties and thereby violates the rights of another, a cause of action is thereby created in his favor against the defendant for the injuries received in consequence of such negligence; and if the injuries result in the death of the party, the cause of action is transmitted by section 2865 to his widow and children.

This section is universal in its operation and embraces within its terms all persons whomsoever excepting fellow-servants. But it has been the universal ruling of this court ever since the decision in the case of Proctor v. Railroad, supra, was handed down, that section 2865 has no application to and did not transmit a cause of action from a servant who was killed by the negligent acts of a fellow-servant to his wife and children, for the obvious reason that he had no cause of action against the master to be transmitted.

The mere fact that the Legislature in 1897 created a cause of action in favor of the servant, against the master, for injuries received in consequence of the negligence of a fellow-servant, is no warrant or justification for this court to write into that section of the statute a survival of that cause of action and a transmission of it to the widow upon the death of the husband when the Legislature has failed to do so.

If, at the time of the enactment of section 2865,

the Legislature had in express terms provided that it should not apply to fellow-servants, then, I apprehend that it would not now be contended that such section would transmit a cause of action created by the Act of 1897 to the widow of the injured servant, yet that is just what this court has uniformly held the Legislature meant by the passage of that statute. [Proctor v. Railroad, supra.]

Clearly, these are the views entertained by the Legislature upon this question, because by an Act of April 13, 1905, it recognized the incompleteness of the Act of 1897, and it expressly provided that the cause of action thereby. created in favor of the fellow-servant should survive and be transmitted to his widow and minor children in case of his death.

As neither the Act of. 1897 nor section 2865 transfers such a cause of action to the widow and children, I feel constrained to hold that the cause of action created by the Act of 1897 in favor of a fellow-servant did not survive his death, nor was it transmitted to his widow and children after his death.

III. It is finally insisted by plaintiff that even though it be conceded that Strottman and the telegraph operator were fellow-servants, and the cause of action given him by the Act of 1897 did not survive him, yet it is earnestly contended that she is entitled to recover in this case because her husband was not provided with a reasonably safe place in which to perform his duties to his master, and that in consequence thereof he was injured and killed.

If that contention was borne out by the record, then, unquestionably, the deceased, had he lived, would have had a good cause of action against the company, because it is the duty of the master to furnish the servant a reasonably safe place in which to work, and if it failed to discharge that duty and the result thereof was an injury to the servant, then he would have had

a complete cause of action against the master, and in case of his death that cause of action would have survived and passed to his widow and children by virtue of section 2865.

In answer to that contention, it is sufficient to say, in the first place, that there is no such question presented by the record in the case. Not a word bordering upon that question is to be found in the petition, evidence or instructions to the jury; and, second, because there is no evidence in the case which remotely tends to prove that there was any inherent danger connected with the place where plaintiff was required to work beyond the ordinary dangers incident to such employment; but, upon the contrary, all the evidence conclusively shows that Strottman lost his life through the negligence of his co-employee in not delivering to him the order to side-track his train at Blackwell so as to permit the north-bound train to pass his at that point.

For the additional reasons herein stated, I concur in the opinion written herein by BURGESS, J.

## DISSENTING OPINION.

LAMM, J.—Strottman was a locomotive engineer in defendant's employ in charge of a locomotive engine pulling a freight train on defendant's track and going south from DeSoto, on the 22d day of October, 1902. Plaintiff, his widow, sued for damages as for his wrongful death and recovered below. From that judgment, defendant appealed here. The cause, assigned to Division Two, was argued and submitted there—subsequently coming into Banc, was reargued and resubmitted. The conclusion reached by Brother BURGESS, to whom the case fell, is that the judgment should be reversed without remanding. This result is so at variance with my views of the law and justice of the case that I am constrained (as one under bonds to give a

reason for the faith in him) to make the following observations:

I.  At a rock cut on a crooked track, by a railroad bridge spanning Big River, Strottman's engine, southbound in the night time, going thirty miles an hour on a down grade, collided "head on" with an engine pulling one of defendant's north-bound freight trains a few miles south of De Soto.  By this collision he was so scalded and otherwise hurt that, after a little while, he died.  He confessedly pulled out of De Soto under orders from his master entitling him to a clear track at the point of collision, unless his running orders were countermanded or subsequently varied before reaching that point.  These orders were not countermanded or varied by the master, and the case may proceed on the assumption that Strottman was about his master's business, in the line of duty, doing what the master told him to do and in the way he was told to do it, without negligence on his part, and resting with confidence on the implied promise of the master to use reasonable care to keep him safe from harm by giving him a clear track, i. e., a reasonably safe field of operations.  Similarly the north-bound freight was running under orders from the same master entitling it to a clear track at the point of collision, unless its running orders were subsequently varied, and varied in time to be effective in taking its right to a clear track from it.

If there was nothing more to the case than that the master, under the foregoing hypothesis, set two trains in motion from opposite points of the compass on a single track, headed towards each other, and allowed the one to hurl itself against the other, the master creating the condition, knowing the result to be inevitable and the trainmen being kept in ignorance of the snare spread for their feet in the condition so created, then no one would contend that such a master would not be liable to his servants for injuries

from the resulting collision, because no master may plead ignorance of the physical law that two imponderable bodies cannot occupy the same space at the same time. A master may not launch forth trains in that way and then fold his arms and go to sleep, leaving trainmen, who confided their lives to his due care, as certainly brought face to face with death or injury as that two and two make four. If that be the law then trainmen are of all men most miserable. 'Tis not so written in the law. The servant does not assume such a risk as that. He assumes the usual and ordinary risks incident to his master's business, but not a risk springing from the master's negligence. The assumption of risks, at root, rests in contract. The servant may be said to impliedly agree to assume the risks necessarily or naturally incident to the business he undertakes. They are known to him, or may be known to him by the exercise of ordinary care, and he is allowed to assume them. But the master cannot contract against his own negligence, for that would be contrary to the policy of our law. By necessary implication there is read into every contract of employment the agreement of the master that he will exercise due care to keep his servants (when in the line of duty) from death or injury. The master, then, assumes that duty towards his servant; and the risks assumed by the servant are those only that are left over and above (and when) the duty of the master to exercise due care has been reasonably performed. [Charlton v. Railroad, 200 Mo. 1. c. 433; Curtis v. McNair, 173 Mo. 270, and cases cited.]

That the train-dispatcher and trainmen are not fellow-servants, that the voice and the act of the train-dispatcher under the foregoing hypothesis are the voice and act of the master is the settled law of this State. [Smith v. Railroad, 92 Mo. 359.] That case

has been cited and followed by many others adopting and approving its reasoning, and applying that reasoning to the circumstances held in judgment in each specific case.

II. But the case at bar goes beyond the foregoing hypothesis. The master in this case, distinguishing between a train-dispatcher and a telegraph operator, claims it came up to high-water mark in exercising due care when it telegraphed an order to its servant, the telegraph operator at Blackwell Station, to stop the north-bound train and require it to take the siding at Blackwell—no matter whether that order was delivered or not. The contention of defendant is that the full duty of the master was performed when an order was conceived in the mind of the train-dispatcher at De Soto requiring the north-bound train to lay out at a certain station, Blackwell, to await Strottman's train, thereby providing a clear track to pass, and when that order was put in concrete form as a dispatch by defendant's train-dispatcher, was handed or communicated to the operator in the dispatcher's office and by him transmitted to the operator at Blackwell Station by telegraph in time for the master's servant at Blackwell (said operator, who was also station agent there), to set his signal board or semaphore to stop the north-bound freight and in time, when stopped, to deliver to the conductor of that train the master's order to take siding there and clear the track.

It is further argued by defendant's learned counsel that the telegraph operator at Blackwell and Strottman were fellow-servants. Assuming, as they do, that this contention will be allowed as sound, the next step in the evolution of their argument is that under the Fellow-Servant Act of 1897 (R. S. 1899, secs. 2873-2876) the right to recover damages for injuries received at the hands of a fellow-servant is, *ex vi termini,* restricted to the injured party alone; and that

such right is not transmitted to the widow or other personal representatives of the injured party in case the injury result in death. To round out their contention, they argue that the Fellow-Servant Act of 1897 does not piece out and may borrow no aid from section 2865 of the Damage Act, which has been in our statutes for over half a century, and which provides that in case an injured party may maintain an action against a wrong-doer, if death had not ensued, then such cause of action survives or is transmitted after death, and that a tortfeasor is subject to an action for damages, notwithstanding the death of the person injured. It is argued that, fellow-servants not being within the purview of the old Damage Act, such act gave no right of action against the master because of the injury of one servant by another who was his fellow-servant; that there being no such right of action as that under the old act, it, as a matter of course, was not transmitted by the old act; that if it did not exist it could not be said to survive or pass over to any one else. Therefore, when the Fellow-Servant Act of 1897 changed this condition of things in part and only gave a right of action against the master in favor of one of its injured servants for the negligent act of a fellow-servant, that right of action, being a new right of action for personal injuries, came within the common law maxim, *Actio personalis moritur cum persona,* and could not be transmitted to the widow or personal representative under the provisions of the old Damage Act, but could survive or be transmitted only by the grace and power of a new legislative act, which act, they say, was supplied in 1905. Therefore, they say, to sum up, that the petition alleges and the facts show the neglect of the operator at Blackwell to carry out the orders of his master was the proximate cause of the injury to Strottman, *i. e.*, he suffered at the hands of his negligent fellow-servant; and that while he, if

he had lived, had a right of action under the Act of 1897 against his master, yet when he died the action perished because the law creating it did not keep it alive, and the old Damage Act, section 2865, does not apply.

Were Strottman and the operator at Blackwell fellow-servants? If so, is there substance in the foregoing contentions? If there is, the case is at an end; if not, the judgment should be affirmed.

III. What light is thrown on the case by the Damage Act of 1905 (Laws 1905, p. 135)? If that act related to and covered only *one* subject, to-wit, the keeping alive (after the death of the injured party) of a cause of action arising in favor of such party against the master for injuries caused by the negligence of a fellow-servant, then there would be great force to the insistence that in the legislative mind such cause of action, up to that time, did not survive, and that the new Act of 1905 created the right of survival. But when it appears, as it does, that the Act of 1905 makes drastic changes in the old Damage Act in many vital particulars and that other reasons for the passage of the act are writ large on its face, the force of such insistence is somewhat spent elsewhere. When we consider, further, that acts of the Legislature not infrequently overlap each other and are not infrequently passed as declarative of existing laws or as supplemental to such laws, as cumulative or auxiliary, or to clear up supposed obscurities or remove supposed incongruities or to parry the supposed impending danger of some certain feared judicial construction, the force of the insistence in hand is still further spent elsewhere. When we consider that this court in the Rinard case, *infra,* and the Powell case, *infra,* itself assumed that the right of action created under the Act of 1897, was transmitted, it is sensible to conclude that the Legislature assumed the same thing, and the force

of the insistence is entirely spent elsewhere. [See Higgins v. Railroad, 197 Mo. l. c. 313.]

But if it be conceded out and out, *arguendo,* that the Act of 1905 will bear only the construction that, in the legislative mind, such cause of action did not survive under then existing laws, yet that concession ought not to be held as determinative of the point; and this for the very good reason that the construction of laws under our scheme of government is with the courts—not with the Legislature; and courts are not bound by a legislative construction, if erroneous, any more than by a legislative act, if invalid. The ideal harmony that should lie and play about the triune-head of the executive, the legislative and the judicial departments of the government, as a halo or *nimbus,* is not to be rudely or lightly blown away, disturbed or dissipated. Therefore, courts lend a willing ear to legislative construction of existing law—this out of decent and due regard for the high dignity of legislative power in a self-governing people. But, when all is said and the last word spoken, courts may not ignore, discard or surrender their duty to construe the law, because the Legislature has construed it—they may be instructed but not bound by that construction.

Deeming legislative construction (even if one may be fairly deduced), as an incident to judicial construction but not a controlling or determinative one, it may be put aside and, in the logical evolution of the case, we reach the question whether the Fellow-Servant Act of 1897 and section 2865 of the old Damage Act must be construed together, the new act as supplemental to the old, each pertaining to the same subject-matter and the new creating a situation and liability upon which the old act, as a general rule of law, is operative. That question will receive consideration in the next paragraph of this opinion. And to avoid misunderstanding, it will do to say that its determination in

favor of defendant should not, of itself, result in a reversal of this case; and this in view of other applicable principles of law to be hereinafter pointed out.

IV.  Section 2865 of the old Damage Act is a general law, engrafting into our system a new principle, and reads: "Whenever the death of a person shall be caused by a wrongful act, neglect or default of another, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured."

Section 2873 (Act of 1897) is as follows: "That every railroad corporation owning or operating a railroad in this State shall be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof: *Provided,* that it may be shown in defense that the person injured was guilty of negligence contributing as a proximate cause to produce the injury."

If these two sections had been passed as parts of one act and had become simultaneously operative as law, it would be put beyond all question that the cause of action sued on in this case survived; because section 2865 says if a party be injured and death ensues, the cause of action survives, provided the injured party himself had a cause of action, and section 2873, seizing the matter at that point, and going on with it, declares that a fellow-servant has a cause of action against a master for injuries received at the hands of a negligent fellow-servant; *ergo,* if the injured party, a fellow servant, had a right of action

under section 2873, it survives under the hypothesis in hand by the express mandate of section 2865.

But such hypothesis, it is argued, does not fit the facts of the case because the two sections were not passed as parts of the same law—the one being an elder and the other a younger legislative utterance; and the controlling question in the case, then, may be stated this way: Are these two legislative utterances to be construed, under recognized canons of construction, as cognate parts of the same body of law, *in pari materia*, the one passed in view of the existence of the other, the one piecing out the other by supplementary enactment, and the intendment of the one illuminated by the intendment of the other when placed side by side? Or are they independent statutes, bearing no relation to each other, each solitary, each moving in its own orbit, having no consociation and each to be construed as if the other did not exist? Is the eye of the law blind to the one when the other crosses the field of its vision?

The general principles of law bearing upon and controlling the foregoing questions, it is apprehended, are not new or in doubt. They have been crystallized into the form of precepts, and if we are to be quickened by those precepts, they should be diligently kept in mind as expounded and laid down. For example, in State v. Pitts, 51 Mo. l. c. 135, it was said: "As illustrative of the intention of the lawmaking power, light may be thrown on the subject by reference to analogous legislation."

In Railroad v. Shacklett, 30 Mo. l. c. 557, it was said: "But when it is doubtful whether the property proposed to be taxed falls within the terms of description used by the law, it is altogether consistent with the rules of construction to resort to other statutes, more specifically appropriate to the subject, for the purpose

of ascertaining the intention of the Legislature in the enactment of the general statute.''

In Dowdy v. Wamble, 110 Mo. l. c. 283, it was said: ''There are few guides to construction more useful than that which directs attention to the prior condition of the law to aid in determining the full legislative meaning of any statutory change thereof.''

In Gabriel v. Mullen, 111 Mo. l. c. 123, it was said: ''In construing any statute it is proper and often useful to consider the state of the law existing at its enactment as casting light on the intended scope of the change made by it.''

In Macke v. Byrd, 131 Mo. l. c. 690, it was said: ''All provisions of law on one topic should be considered in determining the meaning of any particular portion thereof, . . . and such a construction should be given to the latter as will keep all the provisions of law on the same subject in harmony, and give effect to all, when possible.''

In State v. Summers, 142 Mo. l. c. 596, it was said: ''Besides, the statute under review is *in pari materia* with the statute relating to dramshops and to druggists, . . . . and they are to be construed together as though they constituted but one act. This must be done since the litigated statute forms with the others a whole system of which it forms a part. Even cognate statutes, though not strictly in *pari materia*, may be invoked and referred to in order to elucidate the legislative intent. [Sutherland, Stat. Const., secs. 283, 284; Ex parte Marmaduke, 91 Mo. l. c. 257.]''

At one time in the history of this State, the prosecution of crimes by information was strange to our system of criminal procedure. With the statutory law in this fix, a code of criminal procedure was moulded by an aggregation of legislative enactments passed at different times. At a certain period the right to proceed by information in the prosecution of a crime

was grafted into the Constitution, and subsequently into the statutes. These later acts were silent on the right of appeal on the part of defendant when convicted of a crime under an information, the right of appeal being apparently restricted, by the dry letter of existing statutes, to a conviction on an indictment. The question then arose whether an appeal (a purely statutory right) would lie from a conviction on an information. It was held it would not. [State v. Brown, 153 Mo. 578.] Subsequently the same point came up in State v. Thayer, 158 Mo. 36; considering the old as well as the new statutes, deeming them welded into a harmonious whole and to be construed together, in holding that a right of appeal existed (p. 39), the court said: "This construction, flowing *ex vi termini* from the text of the statute, must prevail unless in the history of the legislation and the circumstances of the introduction of these two methods of prosecution into our code, some reason be found for a different construction." Again, coming back to the point and speaking of the ruling in the Brown case, which was disapproved (pp. 43-44), the court said: "This ruling was based solely on section 4277, Revised Statutes 1889, now section 2936, *supra,* treated independently and without any consideration of section 4062, Revised Statutes 1889, now section 2482, *supra.* But when these two sections are considered together in their proper relation to and bearing upon each other, and construed in connection with the code of criminal procedure, of which they form constituent parts, in the light of the circumstances attendant upon their introduction into that code as disclosed by their legislative history, the conclusion, it seems to us, is irresistible, that an appeal does lie for the defendant from a conviction in the circuit court of misdemeanor on information."

The foregoing general propositions, stated in

other forms and steadily applied by this court in the construction of statutes, enacted at different dates, might be fortified by a wealth of illustrations; but enough has been said for the present purpose, which is to show that the Damage Act of 1897 and the old Damage Act must be construed together to effectuate the purpose of the Legislature, when that purpose is once ascertained by construction. The statutes are strictly *in pari materia* and consociated. They relate to damages bottomed on a negligent or wrongful act, whereby individuals are injured; and the phase of this case now under exposition may be completed by borrowing the language of Elliott, J., in Humphries v. Davis, 100 Ind. l. c. 284. That learned judge there said: "A statute is not to be construed as if it stood solitary and alone, complete and perfect in itself, and isolated from all other laws. It is not to be expected that a statute which takes its place in a general system of jurisprudence shall be so perfect as to require no support from the rules and statutes of the system of which it becomes a part, or so clear in all its terms as to furnish in itself all the light needed for its construction. It is proper to look to other statutes, to the rules of the common law, to the sources from which the statute was derived, to the general principles of equity, to the object of the statute, and to the condition of affairs existing when the statute was adopted. [Citing authorities.] . . . . . . . . 'Construction has ever been a potent agency in harmonizing the operation of statutes, with equity and justice.' Statutes are to be so construed as to make the law one uniform system, not a collection of diverse and disjointed fragments. When this principle of construction is adopted, 'an enactment of to-day has the benefit of judicial renderings extending back through centuries of past litigation.' [Bishop, Written Laws, sec. 242b.] 'A statute,' says the author just referred to,

'must be construed equally by itself and by the rest of the law. The mind of the interpreter, if narrow, will stumble.' 'The completed doctrine, resulting from a bringing together of its parts, is that all laws, written and unwritten, of whatever sort and at whatever different dates established, are to be construed together, contracting, expanding, limiting, and extending one another into one system of jurisprudence, as nearly harmonious and rounded as it can be made without violating unyielding written or unwritten terms.' [Bishop, Written Laws, secs. 113a, 86.]"

In the application of the foregoing propositions to the construction of section 2865 and section 2873, Revised Statutes 1899, let us look to the history of the law, to the benefit to be advanced, to the mischief to be struck down, to the existing state of judicial construction of the old Damage Act at the date of the new act, and thereby determine the legislative purpose.

Under the old Damage Act it was held, in 1865, that fellow-servants were within its scope, and that the master was liable for the negligence of co-employees *inter sese.* [Schultz v. Railroad, 36 Mo. 13; Connor v. Railroad, 59 Mo. 285.] This construction of the statute remained the law of this State for eleven years and until 1876 (Proctor v. Railroad, 64 Mo. 112), when the doctrine was exploded; and since the Proctor case it has been the accepted doctrine that the old Damage Act created no right of action against the master in favor of a servant injured by a fellow-servant, and did not create a right of action at all; it simply transmitted one that already existed at common law. [Strode v. Railroad, 197 Mo. l. c. 625, *et seq.,* and cases cited.] It may not be amiss to recur to the reason underlying the assault on the doctrine of the Schultz case: The true grounds for that assault were first stated by NAPTON, J., in a dissenting opinion in the Connor case. It was there pointed out that the purpose of the old

statute was not to create or establish any new rules of liability to the party injured, where he was alive and entitled to his action, *but that the purpose of the statute was to strike down the common law doctrine that a cause of action for personal injuries died with the injured party.* It was said in that dissenting opinion: "The cardinal rule in the construction of a statute is to look mainly at the intent of the law, the defect or grievance proposed to be remedied, and the means provided to effect such remedy. The common law axiom, that *actio personalis moritur cum persona,* was the mischief which the Legislature wished to abolish, and at the same time to point out the survivors who should have the right of action. The distinction between the right of action in passengers and employees, and the cases in which the one or the other might maintain actions, were not in the mind of the Legislature in framing this enactment. They were looking in a different direction. . . . There was no intention of establishing any new rules of liability for damages to the party injured, where he was alive and entitled to his action, but simply to extend the benefit of that liability to certain members of the family of the injured person, when death resulted from the injury." And in the Proctor case it was said: "It [the Damage Act] creates no new cause of action but simply continues or transmits the right to sue, which the party whose death is occasioned would have had, had he lived."

If, then, it be conceded as established (which we assume) that the life and purpose of the old Damage Act were to cut up root and branch the common law doctrine that a cause of action for personal injuries died with the death of the party injured, how comes it that we are confronted with the ghost of that dead and buried doctrine in the present case? Having held that the doctrine was legislated out of life, how comes

it that the stone which the Legislature rejected, like the stone the builder rejected, becomes the chief stone of the corner now—how comes it that when the Legislature in 1897 created a new cause of action for personal injuries by changing another common law rule, to-wit, the rule that a master is not liable for injuries arising to an employee from negligence between co-employees, the dead common law doctrine is invoked to destroy the transmission and survival of the new cause of action created by statute? Might not the Legislature very well approach the passage of the new law with the profound (and rightful) conviction that, since the right of action for personal injuries survives under existing law, all the Legislature had to do was to create a new liability of that same class and character and it would survive because the common law barrier in the way of its survival had been swept away by positive and general statutory law, under the continued and uniform construction of this court?

Is the foregoing not a reasonable view? To my mind it is. Look at the result of a contrary view. The new act provides that the party injured has a right of action. Is it a thinkable proposition that a legislature taking such a legislative step as that would permit a servant to sue the master for personal injuries received through the negligence of a fellow-servant and with one and the same breath would intentionally deny or fail to give that right to his widow, or orphan children? Is it justice to the legislative branch of the government to suppose that it did not tenderly hold in mind the widow and the fatherless? The Supreme Court of Iowa, in reasoning out the same proposition, in the same kind of case, in Philo v. Railroad, 33 Iowa l. c. 51, said: "It cannot be presumed that the lawmakers would secure to employees of railroads a remedy for injuries, not resulting in death, but for the greater injuries whereby life is destroyed, they would

make no provision; thus securing to the employee himself compensation for the lesser injury, but denying to his family, who are dependent upon him for support, compensation for the loss they sustain in his death. We cannot suppose the Legislature that enacted the law was either so short-sighted or heartless as to intend any such result from its provisions. The construction we adopt accords with the language and spirit of Rev., sec. 4111, which makes the perpetrator of an act, resulting in death, liable for the injury, etc.," and the views of that court seem sensible and applicable to the case at bar.

Again: The Damage Act of 1897 put no limitation of time whatever on the right to sue. Is that act, therefore, to be so construed as that an injured party is under no restriction of time, or that we must go to the common law to find the period of limitation? Clearly not. It seems clear that the whole body of the existing statutes should be searched, and when the general statutory rule of limitations governing that class of cases was found, it would control. Again: Let us make a not insupposable case by way of hypothesis. Suppose there was a general statute that all property of whatever description should be assessed for taxable purposes. Suppose thereafter the Legislature passed a law that cats and dogs and the franchises of public service corporations should be deemed and taken as property to all intents and purposes. After the passage of such a law could it be contended that cats and dogs and franchises were not *taxable* property, when by reading the two statutes together it clearly appears that by the new act they became property and thereby passed under the yoke of all burdens incident to property as property?

Let us take another fairly supposable case. Suppose when section 2865 was enacted an amendment had been offered to the effect that its general words

should be restricted by a proviso, thus: "Provided, that the right of survival and transmission hereby created shall not apply to any new right of action created by any new law thereafter passed by any subsequent Legislature." Is it thinkable that such proviso could have found lodgment in a legislative mind quickened by the leaven of the need of general remedial legislation and bent on breaking away from a common law rule unsuited to the times and which had outlived its usefulness? Or suppose when the Act of 1897 was passed it was proposed to inject into section 2873 a proviso, reading thus: "Provided, that when such injured fellow-servant is so seriously injured that he dies, then the purposes of this law are fully subserved, his widow may not sue and his action dies with his death." Can we believe that the General Assembly of 1897 would have entertained such a proposition as that? And yet, in effect, by *construction,* we now read into section 2865 of the old Damage Act the proviso supposed, and read into section 2873 the proviso supposed.

Construing these laws as dovetailing into and piecing out each other and becoming a harmonious part of one harmonious and interdependent system, and applying the rules of construction hereinbefore developed, it seems we ought not to try to escape from the conclusion that when Strottman was given a cause of action under the new act, that cause of action survived under then existing law, even on the view that the question of fellow-servants is in the case.

While the exact point made by defendant and herein considered relating to the Fellow-Servant Act has not hitherto been made, pressed or decided in this court, yet it is not without significance that in at least two cases since the Act of 1897 was passed (Powell v. Sherwood, 162 Mo. 605; Rinard v. Railroad, 164 Mo. 270) it has been held, in effect, that it makes no differ-

·ence in a death case whether a servant received his injuries at the hands of a negligent fellow-servant or other officer or agent or employee of the railroad company; and the personal representative was allowed to recover for the death of such injured party regardless ·of such questions in those cases. Neither must it be ·overlooked that if the theory of the appellant is sustained, viz.: That the right of action existing in Strottman under the Fellow-Servant Act (had he lived) was ·not transmitted to his widow under the provisions of the old Damage Act—then by that holding we strike ·down the reasoning underlying the affirmance of a long line of cases for deaths caused by a negligent violation of imposed statutory or ordinance duty.

For example, take section 1102, Revised Statutes 1899—the bell-and-whistle statute. It is there provided that "said corporation shall be liable for all ·damages which any person may thereafter sustain at such crossing when such bell shall not be rung or such ·whistle sounded as required by this section." The ·statute stops with the creation of the liability. No persons are named who are entitled to the remedy and. ·neither does the statute provide that a right of action for the negligent death of a' person would survive, and yet this court has gone to the old Damage Act. and reading the two together, has always held the widow, the husband or the minor children, as the case may be, ·may sue. [See, for example, Kenney v. Railroad, 105 Mo. 270; Crumpley v. Railroad, 98 Mo. 34.] Precisely the same condition of things obtains in regard ·to section 1103. That section makes a railroad corporation liable for damages from its neglect to construct ·a road-crossing or erect sign-boards of a character pointed out. It says the damages may be "recovered in ·the name of the parties injured." There is not a word in the section relating to a survival of the cause of action if the negligence results in death; and yet this

court steadily held that the old Damage Act may be looked to for the right of survival. [King v. Railroad, 98 Mo. 235.] The same may be said of every action this court has sustained in behalf of a widow, a husband or minor children where the cause of action was the negligent death of a person through the violation of some ordinance duty relating to speed, vigilant watch, or the well-manning of moving cars in towns, etc. In each of these instances the right of survival has been applied to negligent deaths caused by the violation of ordinance duty, i. e., the old Damage Act has been applied and its penalties have been recovered for such violations. The same thing is true of violations of the statute in regard to fire-escapes and kindred violations of laws passed from time to time. Were all these decisions erroneous in either directly holding or assuming that the old Damage Act, creating once for all the right of survival in this class of cases, applied to any death caused by the negligent violation of either a statutory or common law duty, no matter whether the statute creating the liability sprang into existence before or after the passage of the Damage Act in 1855? And yet if we hold that the liability created under the Fellow-Servant Act in favor of an injured fellow-servant does not survive by virtue of the old Damage Act, we plow up the foundations upon which all those decisions, in principle, rest. As pointed out by the respondent's counsel, the true, guiding doctrine is announced in McQuade v. Railroad, 200 Mo. l. c. 157, where BRACE, J., says for the court: "The right of action given by statute is for negligence—not for negligence as defined by the common law, but as well for negligence that may arise from a failure to discharge a duty imposed by a statute or municipal ordinance. The statute makes no distinction, and we can make none. It contains no such limitation as is contended

for, and we cannot put such a limitation upon its comprehensive terms.''

It therefore follows that the right of action created in favor of Strottman by the Fellow-Servant Act (had he lived) survived to his widow by the Damage Act.

V. In the foregoing paragraph this case has not only been considered from the narrow standpoint that the telegraph operator at Blackwell was a fellow-servant of Strottman, the engineer; but it has been considered as if there was no such a thing known to our jurisprudence as the ''departmental theory''—a designation used for want of a better—as if there was no duty resting upon the master to provide a reasonably safe field of operations for his servant and entitling that servant to a right of action for the violation of that duty. We come now to view the case with these broader propositions lodged in it; and, it is submitted, that as the widow had a right of action for the death of her husband under the narrow hypothesis considered in paragraph four, so, too, she has a right of action under the broader propositions now to be considered.

Speaking of the departmental doctrine, it must be by no means considered as a ''departed'' doctrine. It may not grow or thrive in unfriendly ground, where there is no Paul to plant or Apollos to water, as is abundantly indicated by excerpts from the opinions of eminent judges, quoted by Brother BURGESS in his opinion. But it will do to say that the theory underlying the departmental doctrine, under one name or another, has become a component part of the jurisprudence of this State. For instance, Lanning was a member of a dock crew whose duty it was to unload coal from the cars on a railroad dock and to move the cars back and forward for the purpose of cleaning up the dock. While engaged in this duty and pinching forward a car on the dock, an engineer, whose duty it

was to put the cars of coal on the dock and pull the empty cars away, so negligently ran his locomotive up the incline of the dock, by giving no signal, etc., that Lanning was injured. Thereupon he sued and recovered judgment. The case came here and was considered by us In Banc so late as 1906. [Lanning v. Railroad, 196 Mo. 647.] The personnel of this court was the same then as now, except the term of BRACE, C. J., has expired and our Brother WOODSON (who tried the case, *nisi*) has come upon this bench. In the disposition of that case we all concurred; and it was there said by GANTT, J.: "The defendant Gahagan was an engineer in the employ of the company, in charge of an gine, and worked under the direction of a yard-master by the name of Bottsford. Gahagan had nothing to do with the dock work except to push cars in on the dock and pull them out with his engine. The foreman of the dock crew had no control whatever over the movement of the company's engines. Plaintiff and defendant Gahagan were thus employed in widely different *departments,* 'each looked to a different individual as the master's representative for directions in his work, and had no practical connection with the superior who guided and supervised the acts and conduct of the other.' In Sullivan v. Railroad, 97 Mo. 113, it was held by this court that a track-walker on the railroad is not a fellow-servant with the locomotive engineer, or fireman of a passenger train, and in Condon v. Railroad, 78 Mo. 567, it was ruled that a car-repairer at a station and a trainman were not fellow-servants within the meaning of the rule that exempts the company from liability to a servant for injuries occasioned by the negligence of another servant. And in Hall v. Railroad, 74 Mo. 298, it was held a section foreman and switchman were not fellow-servants, and in Dixon v. Railroad, 109 Mo. 413, a quarry laborer under orders of a foreman, who had control of the quarry and rep-

resented the company there, was not a fellow-servant. with the trainmen on a passenger train. In view of these decisions we think that the workmen so distantly related to each other in the service of a common master as plaintiff and Gahagan were, were not fellow-servants within the meaning of the rule which exempts the master from liability for injuries inflicted by a fellow-servant upon a fellow-servant. It would serve no good purpose to enter upon a general discussion or attempt to enumerate the cases in which employees of a common master are held to be or not to be fellow-servants. In our opinion the reason of the rule forbids its application to the facts in this case," etc.

To the cases cited by Brother GANTT in the Lanning case, as sustaining the departmental doctrine, we may add Moore v. Railroad, 85 Mo. 588, where it was held that a car-repairer and the crew of the engine that ran into the car the repairer was working on were not fellow-servants; also Smith v. Railroad, 92 Mo. 359, holding (as said) that a train-dispatcher and the trainmen were not fellow-servants; Dixon v. Railroad, 109 Mo. 413, holding that a laborer whose duty it was to couple small cars in use to haul rock up an incline across the track, the rock to be crushed and used as ballast for the road, was not a fellow-servant with the engineer of a passenger train; and Tabler v. Railroad, 93 Mo. 79, holding that a master mechanic and wrecking-master was not a fellow-servant of a bridge carpenter. In Relyea v. Railroad, 112 Mo. 86, the defendant was held liable under the departmental theory, and that theory was formulated as follows: "They are co-servants who are so related and associated in their work that they can observe and have an influence over each other's conduct and report delinquencies to a common correcting power; and they are not co-servants who are engaged in different and distinct departments of work." In Schlereth v. Railroad,

115 Mo. 87, this court held, per BURGESS, J., that a locomotive engineer and track-repairer are not fellow-servants. In Swadley v. Railroad, 118 Mo. 268, it was held that a track-repairer was not a fellow-servant with the train crew of a regular freight or passenger train. In Keown v. Railroad, 141 Mo. 86, it was held that the foreman of a street car line and a gripman on one of the cars were not fellow-servants.

In the light of our repeated adjudications, it must be held that the departmental theory must not be put to one side. Unquestionably the Legislature so understood the law, as declared by this court; because in the Act of 1897, whereby fellow-servants were defined, the departmental theory received legislative recognition in the proviso made a part of section 2875, as follows: "Provided, that nothing herein contained shall be so construed as to make any agent or servant of such corporation in the service of such corporation a fellow-servant with any other agent or servant of such corporation engaged in any *other department or service of such corporation.*" Under the Act of 1897 and the new Damage Act of 1905 the question we are considering cannot long continue a live one in railroad litigation, and we may close its consideration (for the purposes of this case) by referring to the remarks of GANTT, J., in Parker v. Railroad, 109 Mo. l. c. 379, viz.: "The main and only difficulty has been to satisfactorily determine at all times whether the employment was a common service, and the employees fellow-servants within the meaning of the rule. And after due consideration we are of the opinion that, unsatisfactory as it may seem, the rule itself must remain *general,* its application *specific,* as the cases arise. This rule, to exempt the master, requires the servants shall be employed by a common master and the servants must be employed in the same common employment."

While it is true, in a loose sense, that a telegraph

operator and an engineer may be said to be engaged in a general way in running a train, yet in final analysis there is no more common employment in a distinct definite branch of work between an engineer of a train and a telegraph operator than there is between a train-dispatcher and an engineer, between a track-walker and an engineer, between a car-repairer and an engineer, or between a track-repairer and an engineer; because, in a broad sense, there is a common employment between each and all, *i. e.*, to assist in running trains; and, therefore, if there is no relation of fellow-servant between the parties mentioned, as has been held, then it may well be held, by the same token, there is no such relation between an engineer and a telegraph operator.

Finally: The departmental theory has received exposition in connection with the principle of law that the duty devolves upon a master to use due care to provide for his servant a reasonably safe field of operation. It has been held that this is a duty the master cannot delegate; and that, to whomsoever it is entrusted, that person becomes the *alter ego* of the master in the eye of the law. This view of the law, entertained in many cases, has been elaborated in two very late ones: Jones v. Railroad, 178 Mo. 528, decided In Banc; and Smith v. Fordyce, 190 Mo. 1, decided in Division.

In the Jones case, through the negligence of servants, whose duty it was to set the brakes on cars not in immediate use and left by them standing on a side track, these cars (in a not unusual windstorm) escaped from the side track, and ran upon the main track, and Jones, an engineer of a regular train on the main track, was killed in a collision with the escaped cars. In that case this court, per VALLIANT, J., with whom BRACE, GANTT and FOX, JJ., concurred, said: "The proposition that the burden is on the plaintiff to prove

his case is conceded, and that the presumption is in the defendant's favor in the beginning, follows as a corollary. It is also beyond dispute that there are dangers incident to the business of operating a locomotive on a railroad, even when the business is conducted with due care on the part of both master and servant; that of such dangers, the servant assumes the risk, and if he is injured through an accident that is incident to the business, without fault of the master, he cannot recover. Proof, therefore, of the mere fact that the servant was injured in the master's service is not sufficient to make out a prima-facie case for the plaintiff. To that extent, the authorities cited in the brief for appellant sustain those propositions. But when cars are found running loose and unattended on the main track at a time and place when and where they are liable to cause the wreck of a regular train, it cannot be said that the danger so incurred is one of the usual and ordinary hazards incident to the business. It is not a usual and ordinary occurrence in a prudently managed business for cars to be found running loose in that manner; it does not ordinarily occur unless some one has neglected his duty, and it is not, therefore, a risk assumed by the servant. And since it is an occurrence not likely to happen in the orderly course of business, when it does happen and a servant is injured in consequence, it calls for an explanation. Upon whom does the burden of making the explanation devolve? It devolves either on the injured servant or on the master. If it was the duty of the injured servant to attend to those cars on the side track, to see that they did not escape, then the burden of making the explanation devolved upon him. But if he had nothing to do with securing the cars in their position on the side track, if his duty related only to the operation of the locomotive engine, then there is no explanation due from him.

"The question of the negligence of a fellow-servant does not enter into this case, because, as was shown by the pleadings and proof, the statute law of Kansas makes the railroad company liable to a servant for the consequences of the negligence of a fellow-servant. But, even at common law, the negligence charged in this case was not the negligence of a fellow-servant. It is the master's duty to furnish the servant reasonably safe appliances and a reasonably safe field of operation. This duty, of course, in an extensive business the master cannot attend to in person, but must intrust to servants, but the servants to whom it is intrusted act in the master's place and perform his duty; and if they are negligent, it is his negligence. It is necessary to observe a distinction between performance, on the one hand, of the work for which the business is undertaken, and the furnishing, on the other, of the appliances and field of operation with which and in which to do the work; in the one, the servants are working for a common master; in the other, the master, either *per se* or *per alium,* is performing his duty to his servant. And whether he acts *per se* or *per alium,* if he fails to exercise reasonable care, he is negligent.

"It was the duty of the master in this case to use reasonable care to prevent those cars escaping, and, therefore, when they were found running loose, so as to imperil the life of the servant who was in the due performance of his duty, the presumption is that the master did not use reasonable care to hold his cars on the side track, and the burden is on him to prove that he performed his duty in this respect; it devolves on him to explain the occurrence."

In the Smith case there was a spur track from the main line of the Kansas City, Pittsburg & Gulf Railroad to a lead and zinc mine, known as the Bankers Mine, said railroad then being operated by Forydce &

Withers, receivers. The servants of Fordyce and Withers, as such receivers, placed a loaded car on this spur track so loaded with timbers for the mining company that its brake was hard to get at. The servants of the receivers so placing said car put a stick of wood under the wheel, and also testified they set the brake. There was evidence on the part of plaintiff that the brake on the car was not set. Presently the mining company desired to move this car and asked the railroad company to send a switch engine to perform that duty. But there was delay in sending the switch engine and crew, and the mining company through its superintendent and its own employees (as often had been done) undertook to move the car. They removed the stick of wood, and at once the car started to move down the track towards the main line. Being unable to work the brake on account of the way the car was loaded, they undertook to stop the car by blocking the wheels; but failing in that, the car escaped on to the main line and there came in collision with a car belonging to defendant on which Smith, one of defendant's servants, was at work as a car-repairer. He was injured, sued and recovered. The case coming here, it was assigned to Division Two, and on the doctrine of Jones v. Railroad, supra, the judgment was affirmed, GANTT, J., quoting liberally from the Jones case, adds: "It was clear that plaintiff, who had no notice of the placing of the car or that the brakes on it were left loose and unset, did not assume the risk of its running down on him while he was engaged in an apparently safe place repairing a car for defendant. The court committed no error in not holding as a matter of law that plaintiff assumed the risk of said loose car running down upon him." [See, also, Koerner v. St. Louis Car Co., 209 Mo. 141.]

Now, apply the doctrine of those cases to the case at bar. The master was under the bounden duty to

use reasonable care to furnish Strottman a reasonably safe field of operation. Whoever held that duty was not a fellow-servant, but held it for the master. When the master put two freight trains on a single track in motion towards each other in the night time, the field of operations, by that act of the master, became unsafe precisely as if the master had allowed wild cars to escape to the main track. It was the duty of the master, then, to use reasonable care to avoid the danger it had created or allowed. That danger could not be avoided except one or the other of the conductors or engineers was notified. It is self-evident that no notice would be availing that failed to reach one or the other of them. No such notice ever reached either one or the other; and the collision, inevitable under the arrangement of the master, happened. Therefore, the duty of the master to provide a reasonably safe field of operations was violated, *ergo,* the master is liable. Who, let me inquire, represented this master in the one particular of providing a reasonably safe field of operations? Was it the train-dispatcher at DeSoto alone? If we hold that to be the law, then the duty of the master was performed when its vice-principal, the train-dispatcher, wrote a dispatch and handed it to his messenger boy to deliver to the transmitting operator for transmission to the receiving operator at Blackwell station, though the dispatch was never sent. If we include the messenger boy as a vice-principal, a mere hand of the master, shall we say that the duty of the master was done when the messenger boy handed the dispatch to the transmitting operator in the train-dispatcher's office? If we do not adopt that view, but take another step and hold it was the duty of the master to see to it that that dispatch got on the wires and was headed towards Blackwell station, as we evidently would have to hold, then what reason can be given for that holding other than that all these

things were successive steps towards notifying the engineer or conductor and changing the schedule of those trains? And when we have held that the duty of the master was to take the *first* step, shall we not hold that it was the duty of the master to take the *last* step—a step which, if untaken, makes all of the other steps of no manner of account? The step of not only receiving that dispatch at Blackwell, but of transmitting it to the engineer or conductor? Look at it from Strottman's standpoint. He was entitled to due care from the master. That due care in this instance could only arise when the conductor of his train or he, himself, received notice of a changed schedule, or the conductor or engineer of the north-bound train received such notice. Whose voice would these trainmen listen for in such dilemma? Plainly the master's voice. Through whose mouth only could the master's voice speak to these doomed trainmen? Plainly only through the mouth of the telegraph operator at some station. That voice never spoke; and this master, whose duty it was to provide safe rules and regular schedules for running its trains, and special schedules for irregular trains, in this instance provided no such schedule and ought not to be heard to complain of a judgment against it for killing a faithful employee under such circumstances.

The judgment should be affirmed.

*Gantt, C. J.*, and *Valliant, J.*, concur in my views.

## ON MOTION FOR REHEARING.

PER CURIAM.—A timely motion for rehearing was filed in this cause, and in addition to suggestions by counsel in this proceeding learned counsel in the case of Broadwater v. Railroad, decided by GANTT, J., in Division No. 2 at its sitting on March 17, 1908 (212 Mo. 437), the same questions being involved, has, with

the permission of this court and counsel for the respondent in this cause, as *amicus curiae,* filed and presented to this court a brief in support of this motion.

It is insisted by counsel filing this brief that the Fellow-Servant statute did not create a new cause of action, but, he says, simply placed the employee of the railway corporation on the same footing that it placed any other person. Then follows the strong and rather remarkable statement that, ''To hold otherwise would be to nullify the plain meaning of the statute and strip it of its usefulness. To contend that the Legislature intended such a result, would be to brand them as 'monsters of injustice,' as such a construction would give a right of action for the trifling injury to the employee, but deny any recovery if his wound were mortal.''

It is sufficient to say of this statement that, if there was any warrant or justification in making it, then counsel has failed to discharge his full duty by not also adding that the common law itself and the great commonwealth of Missouri are entitled to the same brand as the Legislature, ''monsters of injustice,'' for the reason that the common law was so inhuman as not to recognize the right of one fellow-servant to recover against a corporation for the negligence of another fellow-servant, and this commonwealth, with her boasted intelligence and fairness in dealing with her citizens, allowed over three-quarters of a century of her existence to elapse before she recognized the propriety of the rule for a recovery by one fellow-servant for the negligence of another.

The common law, which was regarded as the perfection of wisdom and fair dealing with the citizen, did not recognize the rule of survivorship of actions in causes even where persons were injured and killed, who were not engaged in the service of the corporation. As to those persons there was no right of survival

until the enactment of section 2865, Revised Statutes 1899.

It is but common, in fact it is in accord with the proper instincts of humanity, to sympathize with those who have received injury or with those who have lost members of the family by the infliction of injuries, yet that does not justify the brushing aside of plain legal principles when confronted with a legal proposition, and we are unwilling to follow the views of learned counsel to the extent of saying that the common law itself, as well as this great State, should be branded as "a monster of injustice" in failing to recognize the rule suggested in this cause.

The proposition that the operator and agent and the engineer, Mr. Strottman, were fellow-servants, was fully discussed in the original opinion in this cause; in fact, learned counsel in their oral arguments, as well as in their briefs, give that subject very little attention. If there was any doubt upon that proposition it is clearly set at rest by applying the tests as to when persons are to be held as fellow-servants, pointed out by GANTT, C. J., in the case of Koerner v. St. Louis Car Co., 209 Mo. 141, and in his discussion of the proposition in the recent case of Tabor v. Railroad, 210 Mo. 385.

The recovery in this action is not sought upon the ground that the defendant was guilty of negligence in selecting an incompetent servant. That would present an entirely different proposition. In the absence of any showing to the contrary, it would be presumed that the operator or agent was a competent servant, notwithstanding he was guilty of negligence in this particular case. Hence, this action is predicated upon the negligence of the operator or agent, who was the fellow-servant of Mr. Strottman. When the master had transmitted his directions to the fellow-servant of the engineer, he had performed his full duty in that

respect, and if any negligence was to be attributed to the master it could only be that of negligence in the selection and employment of an incompetent servant, which negligence is not involved in this proceeding; therefore, this case, in its last analysis, is one in which one servant has lost his life by reason of the negligence of a co-servant engaged in a common-service of operating a railroad. At common law no action could be maintained by a fellow-servant to recover damages for injuries against a corporation or person by reason of the negligence of a fellow-servant, and such a cause of action was absolutely unknown in this State until the Fellow-Servant Act was enacted by the Legislature in 1897.

We are unable to give our assent to the contention that the Fellow-Servant Act did not create a new cause of action. The proposition is self-evident that until the enactment of the Fellow-Servant statute in 1897, in this State a servant who was injured through the negligence of a fellow-servant never had any right of action; hence, it must logically follow that that statute for the first time giving him a right of action created a new cause of action which did not exist prior to that time, that is, in favor of the servant. To say that it did not create a new cause of action, but simply placed the employee of the railroad corporation on the same footing that it placed any other person, falls far short of a correct solution of that proposition. We have had statutes enacted in this State defining the rights of husband and wife. Some of them have made provisions for the assertion and protection of the rights of the wife by an action by the husband; subsequently those statutes have been changed by providing that the wife might maintain a cause of action in the assertion and protection of her own rights. Will it be seriously contended that, when such statutes are changed, they do not then create a new cause of action as

applicable to the wife? In other words, they give her a cause of action that did not exist prior to the change in the enactment of the statute. A statute which gives to a particular class of persons a cause of action and excludes others, the very moment the statute provides that the excluded persons shall have a cause of action, as to those persons there is no escape from the conclusion that it is a new cause of action, for the reason that it never existed before in their behalf.

The fundamental error of the contention of learned counsel is in assuming that, because a cause of action has existed for years in favor of a particular class, when a statute is enacted embracing another class which had hitherto been excluded, it is to be treated as the same old cause of action applicable to both classes. This contention in our opinion is unsound and illogical, and in our judgment there can be but one conclusion, that is, as to that class to whom the statute was applicable for a number of years, it might be termed an old cause of action, but where the statute for the first time provides that another class shall have a cause of action, as applicable to that class, there can be no question but what the statute has created in their behalf a new cause of action. It was clearly not an old one and was manifestly a new one, for they never had it before.

Upon the proposition that this action survived to the plaintiff, our attention is directed to the numerous cases against street railways for injuries resulting from the failure to observe certain ordinances enacted by the city concerning the running of cars. The argument predicated upon these cases is that the causes of action were held to survive to others; yet there was no statute providing for their survival. The correct response to that argument is that the negligence by street railways in violating duties imposed by city ordinance, was not a new cause of action. The imposition of cer-

tain duties and restrictions upon the street railways and the violation of those duties did not create a new cause of action. The violation of duties imposed by law upon a corporation or others was negligence at common law, and if such negligence resulted in injury it was actionable negligence. It is not the imposition of the new duties and restrictions upon the street railway that creates the cause of action; it is the violation of a duty imposed by law upon the corporation that constitutes negligence, upon which an action may be predicated if injury should result therefrom, and this was so at common law. The violation of a duty imposed by city ordinance is the same kind of negligence as that for violation of a duty required by the common law, and it is the negligence in both instances which constitutes the cause of action, and not the imposition of the duties, the violation of which constitutes negligence. Therefore, it follows that the cases to which our attention has been directed do not support the contentions of respondent, for the reason that the causes of action there being treated were not new causes of action created the first time by the statute.

It is further suggested in the brief filed by counsel *amicus curiae* that our statute was borrowed from the statutes of Minnesota and Texas, and that prior to the time our statute was enacted the Minnesota statute had received several constructions in several different cases by the Supreme Court of that State, and that we upon adopting the statute adopted it with the construction that had been placed thereon. That this is a rule of statutory construction is not to be controverted, but we have carefully examined each and every case from the State of Minnesota, as well as from the State of Texas, and find that the question involved in this case was not in issue in either of those cases, and that in respect to the question now before this court there was

no construction placed upon either the Minnesota or Texas statutes.

But aside from all this, as applicable to the Act of 1897, the lawmaking power of this State has given its own interpretation to that statute by subsequently providing for the survival of the action based upon the provisions of the fellow-servant law. It is clearly pointed out by Judge GANTT in Broadwater v. Railroad, supra, that the question involved in this proceeding has never been in judgment before this court. The Act of 1905 was manifestly a legislative recognition that the right of survival of a cause of action based upon the Fellow-Servant Act was not conferred or in any way provided for by such act, and that one of the leading purposes of the Act of 1905 was to cure the omission respecting the survival of actions in the Act of 1897.

The motion for new trial should be overruled, and it is so ordered.

*Gantt, C. J., Valliant* and *Lamm, JJ.,* dissent.